IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA 1858.

## Mott *et al. versus* The Pennsylvania Railroad Company *et al.*
## Mott *versus* The Same.
## The Same *versus* The Same.

The legislature has no power to alienate any of the rights of sovereignty, such as that of taxation, so as to bind future legislatures; and any contract to that effect is void.

The rights of sovereignty are a trust, to be exercised for the benefit of the people, as occasion may require; not to be abandoned or bargained away at the discretion of their agents.

The Act 16th May 1857, for the sale of the Main Line of public improvements, is unconstitutional, in so far as it provides that, if the Pennsylvania Railroad Company shall become the purchasers, they shall pay, in addition to the purchase-money at which it may be struck down, the sum of $1,500,000; *in consideration whereof,* the said railroad company, and the Harrisburg Railroad Company, shall be discharged by the Commonwealth *for ever* from the payment of all tonnage taxes, and all other taxes whatever, except for school, city, county, borough, and township purposes.

The canal commissioners, as public officers, and any loan creditor of the state, or tax-payer, have such an interest in the question as will authorize them to maintain a bill for an injunction to prevent the execution of such an unconstitutional act.

The act provided that the sale should be made by the governor: *held*, that as this was not a part of his official duty, as executive of state, but merely ministerial, an injunction might issue against him.

The act is not unconstitutional so far as it provides for the sale of the public works; and the holders of state loan, whether they have a specific lien on the tolls of the public works, or not, have no right to object to a sale thereof by the state.

(9)

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

A dissenting stockholder of the Pennsylvania Railroad Company cannot have a preliminary injunction to prevent the company from becoming the purchasers, under the authority of the act. His rights can only be determined on the final hearing.

IN EQUITY. Motion for special injunction.(*a*)

These were three bills in equity. 1. The first was filed by Henry S. Mott, Arnold Plumer, and George Scott, as Canal Commissioners of the State of Pennsylvania, and as individual taxpayers, against the Pennsylvania Railroad Company and its officers, his Excellency James Pollock, the Governor of Pennsylvania, and Henry S. Magraw, the State Treasurer.

It set forth that the complainants had been duly elected to fill the office of canal commissioners of the Commonwealth, and had been duly qualified according to law; and that they held and exercised the said office, and were boumd to perform the duties thereof as prescribed by law.

That the Commonwealth of Pennsylvania was, and had been for many years past, the proprietor of certain lines of railroad, canal, and slack-water improvements, for the transportation of freight and passengers, a portion whereof composed what was known as the Main Line of the Public Works (which they described), at a cost of $18,000,000, and upwards; and also of sundry cars, engines, locomotives, trucks, and other property used in connexion therewith.

That the complainants, by virtue of their office, and according to existing laws, were in possession of said property for the use of the people of the Commonwealth, who had constituted them their executive officers in regard thereto, and that they were managing the same according to law, and deriving large incomes and revenues therefrom for the use and benefit of the state and the people thereof; and that they were advised and believed that it was their duty to protect the said property from loss, sacrifice, or destruction, and from and against all unlawful or wrongful interference or intermeddling therewith by any person or persons whatsoever.

That by an Act of Assembly passed the 16th May 1857, it was provided, that the said Main Line of Public Works, with the said property used in connexion therewith, should be put up at sale, by public vendue or outcry, in the manner therein mentioned, and that the governor of this Commonwealth should act as, or substitute some, auctioneer at such public vendue, for the sale thereof; and that it was further provided in the said act, that the minimum price at which the said property should be struck off to the bidder, should be $7,500,000; provided that if the said Pennsylvania Railroad Company should become

(*a*) This motion was heard and decided at Harrisburg, in June 1857.

the purchasers of ·the said Main Line, at said public sale, or by assignment from the bidder, they should pay, in addition to the purchase-money at which it might be struck down, the sum of $1,500,000; the whole amount of sale to be paid in the bonds of the company, bearing interest at the rate of five per cent. per annum, payable semi-annually, on the 31st days of January and July of each year; $100,000 of which said bonds to fall due on the 31st day of July 1858, and $100,000 thereof annually thereafter, until the 31st day of July 1890, when $1,000,000 of the residue should fall due, and $1,000,000 annually thereafter until the whole was paid. And that it was further provided in said act that, upon the execution and delivery of said bonds to the treasurer of the state, the said Pennsylvania Railroad Company, and the Harrisburg, Portsmouth, Mount Joy, and Lancaster Railroad Company should, *in consideration thereof, be discharged by the Commonwealth, for ever, from the payment of taxes upon tonnage or freight carried over the said railroads; and the said Pennsylvania Railroad Company should also be released from the payment of all other taxes or duties on its capital stock, bonds, dividends, or property, except for city, borough, county, township, and school purposes.*

The complainants annexed to their bill a detailed statement of the incomes and revenue of the said Main Line of Public Works, received by the canal commissioners, and paid into the state treasury, during the five years last past; and also of the sums paid into the treasury for tonnage tax, and the amounts paid for other taxes, by the Pennsylvania Railroad Company, and the Harrisburg, Portsmouth, Mount Joy, and Lancaster Railroad Company, which they prayed might be taken as part thereof.

The complainants further set forth that they were respectively residents and owners of real and personal property, within the state of Pennsylvania, and as such were bound by law to pay, and did pay, all taxes justly assessed and levied upon the same; and as such citizens, residents, and owners, were directly interested in every question which could or might in any wise increase or augment the amount of said taxes chargeable upon their property in the said state, whether by the waste and mismanagement of the sources of public revenues, or *by selling or giving away the taxing power of the state* to favoured corporations or individuals.

That his excellency James Pollock, governor of the state aforesaid, acting under the directions of the said Act of Assembly, and only in discharge of the supposed duty therein devolved upon him, in regard to said public vendue, and not in pursuance of any executive or other duty devolved upon him as governor of the Commonwealth, by the constitution and laws thereof, had advertised the said canals and railroads, and other real and personal property, known as the Main Line of the Public Works of the state, with

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

the appurtenances, for sale, at public auction, 'at the Merchants' Exchange, in the city of Philadelphia, on Thursday, the 25th of June 1857; and they charged that he would, unless restrained by the injunction of the court, direct, allow, and permit the same to be sold at such public auction, and that he would allow and permit the said Pennsylvania Railroad Company to become the purchasers thereof at the said sale, or by assignment from some person or persons who might become the purchaser or purchasers thereof, at such public sale or vendue aforesaid. And that the said Henry S. Magraw, the state treasurer, would, unless restrained by the injunction of the court, accept and receive the bonds of the said Pennsylvania Railroad Company, in payment of the said purchase-money, as directed by the said act.

They further charged that the said defendants threatened and intended to convey, or cause to be conveyed, to the said Pennsylvania Railroad Company, directly or indirectly, by means and color of the said Act of Assembly, the said Main Line of the Public Works, with the appurtenances, and to disturb the complainants in the possession, management, care, and control of the same, and to oust and dispossess them therefrom.

They further charged that the said Pennsylvania Railroad Company, by their servants, officers, and agents, promoted the passage of the said Act of Assembly, with the view and intent of becoming the purchasers of the said works, and with the object of purchasing from the state, and securing to themselves, an exemption from tonnage and other taxes; which exemption they charged would, if said company could lawfully purchase, and if the legislature could lawfully sell the same, amount, within the period of credit allowed by the said act, to a sum greater than the price of the Main Line and appurtenances therein fixed and prescribed.

And they averred that they were advised and believed that the said Act of Assembly was an unwarrantable assumption of power by the legislature, not conferred upon them by the constitution, and was therefore, and otherwise, an assumption upon the rights of the people, and wholly invalid, null and void. And that the foregoing matters were the prominent terms and conditions of the intended sale of the said Main Line to the Pennsylvania Railroad Company, or other corporate purchaser, as set forth and contained in the said Act of Assembly; and that they were advised and believed that the same were illegal, and that any contract founded thereon was forbidden by law, and ought to be prevented; and that any attempt to enter into, or to execute the same, ought to be restrained by the equitable powers of the court.

They therefore prayed that the defendants might be restrained by a preliminary injunction from selling or purchasing the said Main Line of Public Works, according to the provisions of the said Act of Assembly, and that the said Act of Assembly might

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

be declared and decreed, in so far as the same regards the terms and conditions of such sale, to be unconstitutional and void; and for further relief, &c.

2. The second bill was filed by Henry S. Mott, as a loan creditor of the Commonwealth of Pennsylvania, as well for himself as such other loan creditors of the Commonwealth as might choose to come in and contribute to the expenses of the suit, against the same defendants. It set forth that the state was the proprietor of a line of canals 283 miles in length, extending from Columbia to Hollidaysburg, and from Johnstown to Pittsburgh, of the cost and value of many millions of dollars. That said canals were completed and in navigable order about 1830, and had ever since been, and were then in use, yielding to the state certain incomes, tolls, and revenue.

That the state constructed said canals with money borrowed for that express purpose, for which she issued her certificates of loan, from time to time. That prior to any of said loans being offered, by an Act of Assembly passed 1st April 1826, it was provided that the *tolls* that might be taken *on the whole of the* said canals, when completed, should vest in commissioners "for *the purpose of paying the interest, and purchasing, or reimbursing the principal of any and all loans which might*" thereafter "*be made for defraying the expense of constructing said canal,* and the charges incident to the management of the said fund, and they were *all and singular thereby pledged for that purpose.*"

That the loans made for defraying the expense of constructing said canals, after the date of the said act, amounted to many millions of dollars, and were still outstanding and unpaid; and that complainant was advised and believed that the said pledge of the tolls of said canals was also a pledge by the state to keep and maintain the canals, and that such pledge was irrevocable, without the consent of the holders of said loans, so long as they remained unpaid.

That by an Act of Assembly passed the 16th May 1857, it was provided that said canals, with other state works, should be put up at public sale, and sold at a minimum price of $7,500,000; provided that if the Pennsylvania Railroad Company should purchase the same, the price should be at least $9,000,000, on a certain credit, payable in the bonds of the company; and *the state thereupon releasing to the said company a large amount of her annual revenues.*

That more than $9,000,000 were borrowed by the Commonwealth to construct her improvements, including said canals, after the date of the said act, in which the state pledged the tolls of said canals to her said loan creditors; that the state, by the sale and contract authorized by the Act of 16th May 1857, would further *weaken her resources by sacrificing and yielding a large*

*portion thereof* in favour of the said company; that said company was already encumbered with mortgage debts and other liabilities to the amount of $6,000,000 and upwards; and complainant was advised and believed that such sale, if made in pursuance of said act, would violate the said pledge, made for a valuable consideration paid upon the faith thereof, and that, in this, the said act was in conflict with the constitution of the United States.

That complainant was the owner, in his own right, of a certificate of state loan, to the amount of $1000, being a portion of the loan authorized by Act 22d April 1829, to defray the expense of constructing said canals; and that the said pledge contained in the said Act of 1st April 1826, was the security for said loan as therein provided.

That the governor had advertised the said canals for sale, in pursuance of said Act of 16th May 1857, and that he intended to sell the same; and the complainant charged, on information and belief, that the Pennsylvania Railroad Company intended to purchase the same, under said act, and to carry out said purchase by issuing bonds in payment therefor, and taking possession of said canals.

He therefore prayed that the defendants might be restrained by injunction from selling or purchasing said canals, according to the provisions of said act. And that said Act of Assembly might be declared to be repugnant to the constitution of the United States, and utterly null and void; and for further relief, &c.

3. The third bill was filed by Henry S. Mott, as a stockholder of the Pennsylvania Railroad Company, as well for himself as for such other stockholders of said company who might choose to become parties to the suit, and contribute to the expenses thereof, against the same defendants. It set forth that by the act to incorporate said company, passed the 13th April 1846, the said corporation was authorized and limited to survey, locate, and erect a railroad from Harrisburg to Pittsburgh, with authority to extend the same to Erie. That said road was constructed, and had been in public use for several years, and was yielding large incomes to the stockholders, and that complainant was a stockholder and corporator thereof in his own right, and entitled to all the privileges and immunities of a stockholder and corporator.

That by the third section of the said act, the authority of the president and directors was limited to "conduct and manage the affairs and business of the said company," and to "make, ordain, and establish such by-laws, rules, and regulations, and do and perform such other matters and things *as are by the said act authorized;*" and by the fourth section of the said act it was provided, that at the annual meetings of the stockholders of the said company, they, the said stockholders, should have full power and authority to make, alter, or repeal by a majority of votes given,

any or all of such by-laws, rules, orders, and regulations as aforesaid, and do and perform every other corporate act *authorized by their charter*.

That the Commonwealth of Pennsylvania was the owner of certain canals, railroads, and other property connected therewith. That said canals were 283 miles in length, requiring heavy expenditures for repairs and expenses, and had not for many years yielded income sufficient to pay the cost of keeping them in navigable order.

That by Act 16th May 1857, it was made the duty of the governor to offer said public works for sale, in one lump, being the whole Main Line of the Public Works. (The complainant then set forth the terms upon which the said company were authorized to become the purchasers of the same.) And that it was further provided in said act, that if any stockholder should exercise his right to refuse to comply with said act, after a majority of the stockholders should have accepted the same, his stock might be appropriated by the company, without his consent, on paying him the full market value thereof.

That the governor had advertised the said works for sale, and would, unless restrained by injunction, permit said company to become the purchasers; that the state treasurer would receive their bonds in payment; and that the said company threatened and intended to become the purchasers thereof, and to give their bonds for the purchase-money; and to take possession of, and maintain, the said canals and railroads, and encounter and assume all the debts, expenses, and obligations incident to the purchase, maintenance, and repairs thereof, to the manifest injury and detriment of complainant and such other stockholders and corporators of the said company as refuse to assent to the adventure and speculation intended to be embarked in by the said president and directors.

The complainant charged that the purchase and maintenance of said works, would be a gross and palpable departure from, and violation of, the charter of the company; and that the same would be such a material and fundamental change in the object, character, and purpose of the said charter, as could not be imposed by the legislature, against the objection of any stockholder or corporator having a vested and valuable interest in the property of the company, without a palpable violation of the constitution of the United States. And that the provision authorizing the company to appropriate his stock to their use, without his consent, was also a violation of the constitution.

He therefore prayed that the sale and purchase of the Main Line might be enjoined, and that the act might be declared unconstitutional.

On the filing of these bills, leave was given to move for a pre-

liminary injunction. And on the hearing of this motion the governor presented an affidavit, in which, protesting against the jurisdiction of the court in the premises, and against the right of the canal commissioners to be heard therein, concerning any of the matters set forth in their bill, he made the following statement and protest:—

"That the Commonwealth of Pennsylvania is the owner of the public improvements described in the bill of complaint, and known as the Main Line of the Public Works; that the complainants are the canal commissioners of this Commonwealth; that they have not vested in them any portion of the supreme executive power thereof, but are ministerial agents, having certain limited powers, specially delegated to them by Acts of Assembly, and entirely subject to the direction and control of the legislature; that so far from being, by virtue of their said office, now in possession of the Main Line of the Public Works, and receiving the incomes and revenues thereof for the use of the state, as is charged in their said bill, they are not entitled to receive any portion of the said incomes and revenues, but the same are payable of right into the state treasury, and the legal possession of the said public works is in this Commonwealth.

"That by an Act of Assembly, approved the 16th day of May, A. D. 1857, entitled 'An Act for the sale of the Main Line of the Public Works,' it is, among other things, made the duty of the governor to give public notice of the time and place of sale, and to have offered at public sale the whole Main Line of the Public Works, in manner and form as in the said act is prescribed.

"That the said act, so far as this affiant knows, or is informed and believes, was a legitimate and constitutional exercise of the legislative power, and was passed in pursuance of a policy deliberately adopted by the legislature and sanctioned by the people; as expressly declared by popular vote and by repeated acts of legislation; and that this affiant, in discharge of the executive duty imposed upon him as governor of this Commonwealth, has advertised the said Main Line of the Public Works for sale; that it is his design and purpose in all respects to perform the duties imposed upon him, and to comply with and obey the said Act of Assembly; and he denies the right or the power of this court to obstruct or interfere with him in the exercise of his functions as supreme executive officer of this Commonwealth."

Affidavits were also read on behalf of the Pennsylvania Railroad Company; denying that they had promoted the passage of the Act of 16th May 1857, with a view of becoming the purchasers of the Main Line; and averring that the said Act of Assembly was in accordance with the settled policy of the state, evinced and declared by the direct popular vote, by repeated acts

of the legislature, and by the recommendation and approval of successive governors of the Commonwealth.

That the sale of the public works would relieve the state from a heavy burden which has been frequently charged to be owing, in a great degree, to the mismanagement necessarily incident to the ownership and control of such works by a state, and would at the same time separate the affairs of the government from such enterprises as can be better conducted by private or corporate skill and capital.

They denied, that if the said Main Line should be purchased by the company at a fair price, upon the terms and conditions specified in the act, the stock of the said company, or the interest of any individual holder thereof, would be thereby impaired or diminished in value.

And they further denied, that the said Henry S. Mott was a *bonâ fide* holder of any of the capital stock of the company; but they averred, that if he was the owner of any of said stock, his ownership did not exceed three shares, of the par value of $50 per share, and that the same was acquired by him on the 14th May 1857, after the passage through the legislature of the act for the sale of the Main Line, while the same was in the hands of the governor, waiting his approving signature, and only two days before it received the same, and with full knowledge on the part of said Mott that the said bill had passed, and in the belief that the same would be approved by the governor, and after having, to the utmost of his ability, unsuccessfully resisted the passage of the said act by the legislature.

That the said Henry S. Mott, the complainant, acquired the said three shares of stock solely for the purposes of this litigation, and with the design and intent, through it, of defeating the legislation of the state in reference to the sale of the Main Line of the Public Works. And that he had thus voluntarily intruded himself into the said company for the sole purpose of raising questions and disputes in respect to the sale and purchase of the said Main Line, and to vex and harass the said company, and to embarrass it in the exercise of a lawful right to make said purchase, should the said company so determine; and also with the design and intent to prevent any sale of said works by the Commonwealth. And they submitted that he could in no equitable sense be regarded as a stockholder of said company, and that this proceeding was a mere experiment of litigation.

That the said complainant, as such pretended stockholder, should be indemnified against all conceivable loss or damage to him, as a stockholder, by reason of the said purchase, if made, or any consequence resulting therefrom; and for that purpose there was filed with said affidavit a bond, in the penal sum of $10,000, to indemnify and save him harmless from all loss or damage by reason

thereof; and any other and further indemnity or undertaking for his protection would be given to him as the court might direct. And that the said company were advised and believed that they might lawfully bid at the said sale, and become the purchasers of the said Main Line; and if it should be decided by the board of directors that it was expedient so to do, they would, unless prevented by the order of the court, bid thereat, and become the purchasers of the same, upon the conditions expressed in said act, if the same could be had at a price satisfactory to the company.

*Buckalew, Hirst, Walton,* and *Meredith,* for the canal commissioners.—(1.) The powers of sovereignty confided to the legislative body of a state are a trust committed to them, to be executed to the best of their judgment for the public good. And no one legislature can, by its own act, disarm their successors of any of the powers or rights of sovereignty confided by the people to the legislative body, unless they are authorized to do so by the constitution under which they are elected. They cannot, therefore, by a contract, deprive a future legislature of the power of imposing any tax it may deem necessary for the public service, or of exercising any other act of sovereignty confided to the legislative body, unless the power to make such a contract is conferred upon them by the constitution of the state: 16 *How.* 431; Bank of Pennsylvania *v.* Commonwealth, 7 *Harris* 152; Sharpless *v.* Mayor of Philadelphia, 9 *Harris* 167. The power of taxation is not the subject of contract, of barter, or sale, by the legislature, and such attempted contract would be void: Debolt *v.* Ohio Life Ins. and Trust Co., 1 *Ohio St. Rep.* 563, 578, 582; Mechanics' and Traders' Bank *v.* Debolt, *Id.* 591; Knoup *v.* Piqua Bank, *Id.* 604; Toledo Bank *v.* Bond, *Id.* 659, 698; Plank Road Co. *v.* Husted, 3 *Ohio St. Rep.* 578; Norwalk Plank Road Co. *v.* Same, *Id.* 586; Brewster *v.* Hough, 10 *N. H.* 138; Presbyterian Church *v.* City of New York, 5 *Cowen* 538.

The cases of State Bank of Ohio *v.* Knoop, 16 *How.* 369; Ohio Life Ins. and Trust Co. *v.* Debolt, *Id.* 416; Dodge *v.* Woolsey, 18 *How.* 331; Mechanics' and Traders' Bank *v.* Debolt, *Id.* 380; and Same *v.* Thomas, *Id.* 384, may be considered together. They are understood to affirm, that a state legislature, when authorized by the state constitution, may agree with a corporation that the dividends of the latter shall be taxed at a fixed rate during a limited and certain time. It is to be observed upon these cases: 1. That they are decisions of a divided court, and therefore without that weight which unanimity would have conferred upon them. 2. That they do not decide the precise question now raised. 3. They conclude nothing as to the construction to be placed upon our state constitution touching the powers conferred

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

by it upon our legislature: Lebanon Bank *v.* Mangan, 4 *Casey* 452.

They also cited, Parker *v.* Commonwealth, 6 *Barr* 511; 4 *Barbour* 71; *Puffendorff's Law of Nations*, B. vii., ch. ix., § 10; *Rutherford's Institutes*, B. ii., ch. iii.; *Smith's Wealth of Nations*, B. v., ch. ii., part 2.

(2.) The same counsel, for Henry S. Mott, as a loan creditor of the Commonwealth, argued that the tolls and incomes of the canals were pledged to the loanholders of the state; and that the property could not be withdrawn from the lien without their assent or payment of the debt: Act 1st April 1826, *Pamph. L.* 166; Act 1st April 1826, *Pamph. L.* 168; Act 9th April 1827, *Pamph. L.* 192; Act 24th March 1828, *Pamph. L.* 221; and Act 22d April 1839, *Pamph. L.* 251.

(3.) For Henry S. Mott, as a stockholder of the Pennsylvania Railroad Company.—The corporate functions of the Pennsylvania Railroad Company are distinctly defined by their charter; and that all other powers are expressly forbidden, will appear by the charter itself, and by the decision of this court: Pennsylvania Railroad Company *v.* Canal Commissioners, 9 *Harris* 20. The provisions of the Act of 1857 constitute a material change in the charter of the company. The 11th section recognises this, in providing that the charter of the company shall be "*modified*, however, so as to *embrace all* the privileges, restrictions, and conditions granted by this act, *in addition thereto*, and *all provisions* in said original act (the said charter) and any supplements, *inconsistent with the privileges herein granted*, shall be and the same are hereby repealed.*"*

The right of an objecting stockholder to restrain a company against a threatened departure from its charter, and a diversion of its corporate property from charter purposes, is established by numerous authorities: Ebaugh *v.* Hendel, 5 *Watts* 48; *Brightly's Equity*, §§ 190–4; *Purd. Dig.* 305–6, 1071; Commonwealth *v.* Bank of Pennsylvania, 3 *W. & S.* 193; Bevans *v.* The Turnpike, 10 *Barr* 176; Baptist Church *v.* Scannel, *Pittsburgh Legal Journal*, 19 August 1854; Bank of Virginia *v.* Adams, 1 *Pars.* 534; Stevens *v.* Rutland and Burlington Railroad Company, 4 *Am. L. R.* 156; Natusch *v.* Irving, *Gow on Partnership, Appendix*, p. 576; Munt *v.* Shrewsbury and Chester Railway Company, 3 *Eng. L. and Eq.* 150; Bank of Kentucky *v.* Schuylkill Bank, 1 *Pars.* 235; Northern Liberties *v.* The Gas Company, 2 *Jones* 321; Commonwealth *v.* Erie and North-East Railroad Company, 3 *Casey* 339; Bank of Pennsylvania *v.* Commonwealth, 7 *Harris* 155; Packer *v.* Sunbury and Erie Railroad Company, *Id.* 211; Pennsylvania Railroad Company *v.* Canal Commissioners, 9 *Harris* 22; Commonwealth *v.* Franklin Canal Company, *Id.* 117, 124; Brown *v.* County Commissioners, *Id.* 87; Delaware and Hudson

Canal Company *v.* Pennsylvania Coal Company, *Id.* 131; Sharpless *v.* Mayor of Philadelphia, *Id.* 188; Commonwealth *v.* Pittsburgh and Connelsville Railroad Company, *S. C.*, 12 March 1855, MS.; Coleman *v.* Eastern Counties Railway Company, 10 *Beav.* 1; *Angell and Ames on Corporations*, § 391–3, 495, 500; Ward *v.* Society of Attorneys, 1 *Collyer Ch. R.* 370; Abbott *v.* Baltimore and Rappahannock Steam Packet Company, 1 *Md. Ch. Decisions* 549; Pennsylvania, Delaware, and Maryland Steam Navigation Company *v.* Dandridge, 8 *Gill & Johns.* 248; Hartford and New Haven Railroad Company *v.* Croswell, 5 *Hill* 385; Livingston *v.* Lynch, 4 *Johns. Ch.* 573; Bagshaw *v.* Eastern Union Railway Company, 7 *Hare* 114, 129; Burning's Case, 2 *Blackf.* 99; Solomons *v.* Lennig, 12 *Beav.* 377; Everhart *v.* West Chester Railroad Company, 4 *Casey* 339; Columbia Bridge Company *v.* Kline, *Brightly's Rep.* 328; Knowles *v.* Beatty, 1 *McLean* 41; Smith *v.* Alabama Life and Trust Company, 4 *Ala.* 558; Green *v.* Spencer, 2 *Sandf. Ch.* 285; Beach *v.* Fulton Bank, 3 *Wend.* 573; Enders *v.* Board of Public Works, 1 *Grattan* 364; Dodge *v.* Woolsey, 18 *How.* 341.

*Franklin, Attorney-General,* for the governor.—The governor is not amenable to this court, or to any court, for the exercise of his executive functions; but is responsible only in the mode pointed out in the constitution. Any judicial interference with the prerogatives of the executive, or with his acts as governor in accordance with the directions of the legislature, would be a violation of the constitution, the natural effect of which would be a collision between the different departments of the government: Marbury *v.* Madison, 1 *Cranch* 137, 165–6, 169–70.

The complainants, as public officers, are not entitled to bring the public rights into this court to be adjudicated upon, and to contest the validity of an act of the legislature on account of its bearing on the public interests. They are merely ministerial officers, all whose movements are subject to the control of the legislature, which is in the constant habit of supervising and directing their proceedings, and of overruling and reversing their acts whenever it is considered expedient to do so.

A legislative act cannot be impeached by evidence in relation to the manner of proceeding, or the motives which induced the members of the body, or the agencies used to procure its passage. It would be unbecoming and discourteous to the legislative body to institute such inquiry; and any attempt to put such questions in issue will always be repudiated by the courts: Fletcher *v.* Peck, 6 *Cranch* 129–131; Jones *v.* Jones, 2 *Jones* 350; Sharpless *v.* Mayor of Philadelphia, 9 *Harris* 161–2.

The naked question, therefore, results, whether the tender to the Pennsylvania Railroad Company of exemption from tonnage

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

tax, and from other state taxes upon their bonds and property, upon their becoming the purchaser of the Main Line, and paying $1,500,000, in addition to their bid, is an unconstitutional assumption of power by the legislature, which renders the act wholly invalid, null, and void?

There is nothing in the constitution of Pennsylvania which expressly, or by necessary implication, limits the legislature in its admitted power of regulating taxation; and in the absence of such provision, the competency of the legislature to part with the taxing power in reference to specified property has been frequently recognised, and cannot at this day be regarded as an open question: New Jersey *v.* Wilson, 7 *Cranch* 164; Gordon *v.* Appeal Tax Court, 3 *How.* 133; State Bank of Ohio *v.* Knoop, 16 *How.* 369, 383–91; Dodge *v.* Woolsey, 18 *How.* 331; Hardy *v.* Waltham, 7 *Pick.* 110; Atwater *v.* Woodbridge, 6 *Conn.* 223; Seymour *v.* Hartford, 21 *Conn.* 481. He also cited various Acts of Assembly, exempting property from taxation, and Finney *v.* Commissioners of Mercer County, 1 *S. & R.* 62; Coney *v.* Owen, 6 *Watts* 435, 438.

*Cuyler, St. G. T. Campbell,* and *Stanton,* for the Pennsylvania Railroad Company.—The bill on behalf of Mott, as a stockholder, is grounded upon entire misconception of the principles by which equity is administered upon a shareholder's bill, as will be seen by an examination of the cases and authorities relied on.

All the cases cited by the complainants, will be found, with but one or two exceptions, to belong to one of three classes, each differing from those now before the court. 1. Cases of private partnerships or unincorporated associations, without public duties or interests. 2. Bills by shareholders, to enjoin violations of law, by excess in the use of, or improper exercise of, the powers vested in the corporation, and to protect the complaining shareholder against irreparable injury. 3. Suits by the corporation against defaulting subscribers for non-payment of their assessment on shares.

The cases of private partnership or unincorporated associations, not connected with public interests, are inapplicable, because,—
1. The associations are exclusively for private profit or purposes:
2. Are controlled by express contract: 3. Are not controlled by legislative power, nor designed to be extended, contracted, or modified by it. To this class belong Natusch *v.* Irving, and Livingston *v.* Lynch.

As to bills by shareholders to enjoin violations of law by excessive use of, or improper exercise of, the powers of the corporation, and to protect the shareholder against irreparable injury; these are inapplicable, because they are aimed against intended violations of the law which has created the corporation, and must

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

exclusively control the exercise of its powers. To this class belong all the remaining cases cited by the complainants, with the exception of those to be presently mentioned as belonging to the third class, and the case of Stevens *v.* The Rutland and Burlington Railroad Company.

No instance it is believed can be found, either in England or in this country, of a preliminary injunction being granted to restrain a corporation from performing an act expressly authorized by legislative authority.

As to suits by corporations against defaulting subscribers for non-payment of assessments on shares. In these cases the corporation could only recover upon the express contract between it and the subscriber, and if the terms of the contract were departed from, by the corporation, upon very obvious principles, there could be no recovery. To this class belong Hartford Railroad Co. *v.* Cresswell; Middlesex Turnpike Corporation *v.* Locke, 8 *Mass.* 268; Indiana and Ebensburg Turnpike Co. *v.* Phillips, 2 *Penn. R.* 184; Irvin *v.* Turnpike Co., *Id.* 466; and Everhart *v.* West Chester Railroad Co.

There is but one case, Stevens *v.* Railroad Company, presented at large in complainant's brief, bearing upon the present, which does not fall within either of these classes, and upon this rests so much of the doctrine laid down by the text writers, Angell & Ames on Corporations, and Brightly's Equity, as seems to afford any colour for this bill. In it are cited most of the authorities referred to in the brief, but even that case varies from the present in the fatal particular that the complainant was an original stockholder in the enterprise, and had not, like Mott, intruded himself into the company for the purposes of litigation, and as a mere contrivance for defeating a corporate action authorized by law.

The case therefore cannot be any authority for this proceeding. An examination of it, however, will show that in no respect can it sanction the present application. No answer was filed, no affidavits presented, although an express charge of fraud was made in the bill, and it would rather appear on its face to have been a contrivance to justify the omission to build the extended road, and to escape the effect of a previous acceptance of an act authorizing that extension. It also appears, from the decree of the court, that the injunction extended no further than was necessary to protect the interest of the complainant in the corporate funds of the company. That provision is here expressly supplied by the condition requiring the company to pay the market value of his stock to any stockholder of the railroad company who may dissent from the proposed purchase of the Main Line.

It seems to be vital to the complainants to maintain that there can be no substantial change in, or extension of power granted to

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

a railroad company without the unanimous consent of every stockholder.

This proposition cannot be conceded; for the defendants it will be maintained that these great companies, created to maintain and promote the policy of·the state, to extend her trade, and to form improved highways for the transportation of passengers, mails, and traffic, upon which every citizen is entitled to place a vehicle to be transported, are not to fall within the same narrow rules of law as are maintained with reference to corporations in their nature exclusively private, and maintained solely for individual profit; that these great companies are to be regarded as *quasi* public corporations, with powers conferred for the public good, and into which every shareholder that enters comes with the full knowledge that their powers and privileges may be from time to time extended as the public necessities may require. This view of the character of such associations is sanctioned by the highest judicial authority in England and in this country, and by the decisions heretofore made by this court: *Co. Litt.* 181 *b*; 4 *Johns. Ch.* 596; Attorney-General *v.* Davy, 2 *Atk.* 212; The King *v.* Beeston, 3 *T. R.* 592; Withnell *v.* Gartham, 6 *Id.* 388; Grindley *v.* Barker, 1 *Bos. & Pull.* 229; Green *v.* Miller, 6 *Johns. Ch.* 39; 5 *Co.* 63 *a*; Ffooks *v.* London and S. W. Railway Co., 19 *Eng. L. and Eq.* 11; Gray *v.* Monongahela Nav. Co., 2 *W. & S.* 159; Erie and N. E. Railroad Co. *v.* Casey, 2 *Casey* 287.

It is wholly immaterial whether the statutory contract for release from taxation is valid or invalid, for if invalid the power of the state to exercise the right to tax in future is not affected, and the bill would stand without the obnoxious provisions: Bank *v.* Commonwealth, 10 *Barr* 449; Hospital *v.* County of Philadelphia, 12 *Harris* 229; Academy of Fine Arts *v.* County of Philadelphia, 10 *Harris* 496.

The opinion of the court was delivered by

LEWIS, C. J.—Three bills in equity have been filed, in each of which a motion is made for an injunction to prevent the sale of the Main Line of the public improvements of the state under the Act of Assembly of 16th May 1857. These motions draw into question the rights of the canal commissioners, of the state creditors, of the tax-payers of the Commonwealth, and of the stockholders of the Pennsylvania Railroad Company, to interfere in the great question involved. On all the questions about to be decided, we now proceed to deliver the unanimous opinion of the whole court.

Although there is some difference in our respective reasons for denying to a dissenting stockholder, who is offered compensation for his stock by the terms of the act, the preliminary injunction asked, we all agree in refusing his motion. His rights are to be determined on the final hearing.

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

We do not consider it necessary to express any opinion on the question whether the holder of a certificate of the state loan has such a pledge of the tolls on the state canals and railroads as could be enforced in a court of justice. Conceding, for the purposes of the present motion, that he has such a pledge, we are nevertheless of opinion that the right of a pledgee extends no further than to require a sale of the thing pledged, and an application of the proceeds to the payment of his claim. This is what the Act of Assembly proposes to accomplish. It is what a court of equity would do under the circumstances disclosed, if the controversy were between private individuals. But the legislature has the right to prescribe *remedies* and change them at pleasure, so that the *rights* of the parties are not materially impaired. We are perfectly satisfied that the rights of the state creditors will not be impaired by a fair public sale of the Main Line to the highest and best bidder, and the application of the proceeds to the payment of the state debt. On the contrary, we are bound to presume, from the evidence before us, that such a proceeding will be highly beneficial to the creditors of the state. It will reduce the amount of the public debt, and render the residue more secure. We have no right to presume that the works will be sold for less than their full value. The creditor has therefore no case for relief on the footing of the pledge of the tolls on the public works.

But the canal commissioners, the tax-payers, and the creditors, object to a contract of sale under which the right to punish the purchasing corporation for misuse or abuse, and the right to tax the Pennsylvania Railroad Company for state purposes, and another company for tonnage, is for ever extinguished. It is alleged that the legislature have no constitutional authority to bind succeeding legislatures in these particulars. If such a contract be unconstitutional and void, the canal commissioners are in the line of their duty in suggesting this objection to the court; and if the court should hold the Act of Assembly void, it would be the duty of the commissioners, as faithful agents of the state, intrusted with the custody and management of the works, to retain possession of them for the use of the Commonwealth, regardless of the unauthorized attempt to deprive the public of their rights. If the legislature have no right to release the means on which the state and her creditors must rely for the payment of her public debt, any creditor whose security is about to be thus impaired, has a right to be heard in opposition to the measure proposed. The tax-payers whose burthens will be necessarily increased by releasing from taxation any portion of property liable to contribute to the payment of the public debt and the expenses of government, have also an interest in the question, and, of course, have a right to be heard.

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

A judgment of ouster against a corporation, duly put in execution, works its dissolution. According to the ancient common law, where there is no statute provision to the contrary, upon the civil death of a corporation, all its real estate remaining unsold reverts back to the original grantors and their heirs. The debts due to and from the corporation are all extinguished. Neither stockholders, nor the directors, nor trustees, can recover debts or be charged with them in their natural capacity. All the personal estate vests in the Commonwealth: 2 *Kent's Com.* 307; 1 *Bl. Com.* 484. But under the modern rule of equity jurisprudence, the severity of the common law in this respect is greatly mitigated, and it is held that it is the *franchise*, and not the property of the corporation, that is forfeited by a judgment of ouster, and that the property of the corporation is a trust fund for the payment of debts, and distribution among stockholders: Wood *v.* Summer, 3 *Mason's R.* 309; Adair *v.* Shaw, 1 *Sch. & Lefr.* 261; Mumma *v.* The Potomac Company, 8 *Peters* 281; Stainton *v.* The Carron Company, 23 *Eng. L. & Eq.* 315; Travis *v.* Milne, 9 *Hare* 141; Bacon *et al. v.* Robertson *et al.*, 18 *How. U. S. Rep.* 480. The 15th section of the Act of 16th May 1857, enables the legislature, at their election, after judgment of ouster, to revoke the privileges of the corporation and to take the roads and canals for public use, giving full compensation to the stockholders. This provision does not vary very materially from the rule which equity would adopt, independent of the Act of Assembly. It is no release of the punishment for injury or abuse. Nor is it a release of the eminent domain under which the corporation may be repealed without either abuse or misuse whenever the public interest requires it, on giving just compensation to the stockholders. The word "may," as applied to the action of the legislature in this respect, is not to be construed as "shall" or "must." If the construction were doubtful, the doubt must be resolved in favour of the state. A corporation can never claim a privilege against the state without showing that it is clearly entitled to it by the terms of the charter. There is nothing in this section which binds the legislature to make "full compensation to the stockholders." That is only to be done if the legislature should by a legislative act revoke the privileges granted; but there is no obligation on their part to pass any act of revocation. If this should not be done, the judgment of ouster, with all its legal and equitable incidents, would remain in full force. There is therefore no release of the right to punish for misuse or abuse, nor any release of the eminent domain, in the provisions contained in the 15th section of the Act of Assembly.

We now come to the vital question involved in these applications. The Act of Assembly of 16th May 1857, makes provision for a public sale; and, for the purpose of inviting competition, directs that public notice of the time and place be given in one

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

or more newspapers, of extended circulation, published in the cities of Philadelphia, Pittsburgh, Washington, Boston, New York, and in the borough of Harrisburg. It authorizes "any person or persons, or railroad or canal company now incorporated, or which may hereafter be incorporated, under the laws of this Commonwealth, to become the purchasers for any sum not less than $7,500,000." But there is a *proviso* in the 3d section, which declares that "if the Pennsylvania Railroad Company shall become the purchasers, at the said public sale, or by assignment, they shall pay, in addition to the purchase-money at which it may be struck down, the sum of 1,500,000 dollars, and *in consideration thereof*, the said railroad company and the Harrisburg, Mount Joy and Lancaster Railroad Company shall be discharged by the Commonwealth *for ever* from the payment of all taxes upon tonnage, or freight carried over said railroads; and the said Pennsylvania Railroad Company shall also be released from the payment of all other taxes or duties on its capital stock, bonds, dividends, or property, except for school, city, county, borough, or township purposes." The amount of taxes proposed to be released is beyond calculation. It can only be conjectured. It would be greatly increased by the tax, which would of course be levied on the property about to be sold to the company. Judging from the increase during the last five years, and the constant augmentation of commerce and travel along the route, it would seem reasonable to believe that in five years from this time it would be double its present amount. But conceding that the tax to be released will hereafter amount to no more, per annum, than the sum paid in 1856, the amount, according to the admissions of the railroad company itself, would be $280,739.21 per annum for ever. This sum is more than equal to the interest on $5,600,000, at 5 per cent., the rate to be charged to the purchasers. In other words, the Act of Assembly proposes to give to the railroad company a consideration equal to $5,600,000, for $1,500,000, and thus to give that company an advantage equal to $4,100,000 over every other bidder at the sale! By means of this privilege the Pennsylvania Railroad Company may drive from the field of competition all other bidders. It is essential to every fair public auction that all the bidders shall stand upon an equal footing. If the object had been to make a fair sale of this portion of the state revenue, it might have been evinced by a provision for the transfer of it to the highest bidder, without any distinction in favour of any one. But this was not done. The extraordinary *proviso* in favour of the Pennsylvania Railroad Company is partial, and entirely repugnant to the general intent of the act; and if allowed to stand, the sale under it will furnish one of the most magnificent exhibitions of a "*mock auction*" that the world has ever witnessed! We rejoice to say that the highly respectable and upright

officers of the corporation disclaim, in the most solemn manner, under oath, all agency in procuring the enactment in question.

But has the constitution conferred upon the legislature the authority to extinguish *for ever*, by bargain and sale, the power to raise revenue for the support of government? All free governments are established by the people for their benefit, and the powers delegated are to be exercised for their common good, and not, under any circumstances, to be sold or destroyed, so long as the nations establishing them have the physical power to maintain their independence. Individuals cannot subsist without food. Deprive them of "the means whereby" they live, and you destroy them as certainly as if you did it by shedding their blood. The necessities of governments are as great as those of individuals. No government can exist without revenues to defray its expenses, and support its officers and agents. The revenue is the food indispensable to its existence. Deprive it of this, and you strip it of all power to perform its duties, bring it into contempt by its uselessness and helplessness, and ultimately destroy it as effectually as if it were overturned by domestic violence, or subjugated by the conquest of a foreign foe.

Government is but an aggregation of individual rights and powers. It has no more right to commit political suicide than an individual has to destroy the life given by his Creator. Contracting away the taxing power in perpetuity tends, as we have seen, inevitably to the destruction of the government. If twelve or twenty millions of taxable property may be released to-day, one hundred millions may be released to-morrow, and the principle being established, the process might go on until all power to raise revenue was gone. If this did not destroy the government, it would result in something infinitely more dangerous to the liberties of the people. It would make it the servile dependant of the wealthy corporations or individuals to whom it contracted away its means of support. Although the taxing power is but an incidental one, to be exercised only as the necessary means of performing governmental duties, it is nevertheless a branch of the legislative power which always, in its nature, implies not only the power of making laws, but of altering and repealing them, as the exigencies of the state and circumstances of the times may require: *Rutherforth's Institutes of Natural Law*, B. 3, ch. 3, § 3. If one portion of the legislative power may be sold, another may be disposed of in the same way. If the power to raise revenue may be sold to-day, the power to punish for crimes may be sold to-morrow, and the power to pass laws for the redress of civil rights, may be sold the next day. If the legislative power may be sold, the executive and judicial powers may be put in the market with equal propriety. The result to which the principle must inevitably lead, proves that the sale of any portion of govern-

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

mental power is utterly inconsistent with the nature of our free institutions, and totally at variance with the object and general provisions of the constitution of the state. It may be urged that we must confide in the fidelity of the legislature, and that there is every ground for hope that they would not carry such measures to an unreasonable length. This is no answer to the argument. It is a question of constitutional authority, and not a case of confidence at all. Limitations of power, established by written constitutions, have their origin in a distrust of the infirmity of man. That distrust is fully justified by the history of the rise and fall of nations.

But, conceding that this practice will not be carried so far as to destroy the government, is there any warrant for it to the extent to which the Act of Assembly proposes to go in the present case? It was held by this court in Wood's Estate, 9 *Harris* 114, that "the duties of sovereign and subject are reciprocal, and any person who is protected by a government in his person or property, may be compelled to pay for that protection. As taxes are to be assessed for the sole purpose of supporting the government, the propriety of exacting them, the persons and property to be made liable, and the rules for their assessment and collection, are to be determined by its authority. It is, however, *a rule of the public law, founded on a principle of justice which no government can disregard without violating the rights of its citizens, that taxes shall be assessed in such manner that all the citizens may pay their quota in proportion to their abilities, and the advantages they derive from the society :*" 9 *Harris* 114; 10 *Harris* 497. This principle is sanctioned by writers of the highest authority: *Vattel*, B. 1, ch. 20, § 240; *Rutherforth's Inst. of Nat. Law,* B. 2, ch. 3, § 5; *Puffendorf's Law of Nations,* B. 7, ch. 9, § 10. It is expressly declared by Baron Puffendorf, that "no immunities or exemptions" (from taxation) ought to be "granted to certain persons to the defrauding or oppressing of the rest." It is upon this principle that when the private property of the citizen is taken for public use, just compensation is to be made to him *out of the common fund,* in order that the contribution to the public interest may fall in a just proportion upon all the citizens: *Rutherforth,* B. 2, ch. 3, § 5. As the legislature are necessarily the judges of the method of assessing taxes, it is to be presumed that they have regarded the rule of contribution sanctioned by justice and the equal rights of the citizens; and their enactments are not always subject to judicial review. Where they make appropriations to institutions of learning or charity, or grant lands or pensions to persons who have served in the defence of the nation, it is presumed to be a compensation for the good that has been done or is to be done to the community. Where they grant to the same institutions or individuals an exemption from taxation,

such grants, for the same reason, are not regarded as a violation of the rules of justice and equity. So long as there is no *contract*, which may tie the hands of succeeding legislatures against repealing such exemptions; and so long as they are not repealed, they seem to have been enforced as a legitimate exercise of legislative power: 1 *S. & R.* 62; 6 *Watts* 435. But where there is no pretence of an intention to equalize the taxation among the people, but an avowed purpose to sell to one class of citizens an exemption from all taxes for ever, and thus to throw all the public burdens upon the other for all time to come, it is, to all intents and purposes, imposing a tax upon them without the consent of their representatives, and is such a plain, palpable, and open violation of the rights and liberties of the people, such a clear case of transcending the just limits of legislative power, that the judiciary is bound to pronounce such an act null and void.

No class of corporations stand more in need of the protection of the government, or occupy more of the time of the legislature and the courts of justice, or occasion more expense to the government, than railroad corporations. From the extensive nature of their operations, the power to take private property for the construction of their works, and their continual collision with each other's interests, and with the interests of individuals and municipal communities, they require the constant and the energetic protection of the strong arm of the government. Withdraw that protection, and they would be left to the mercy of popular outbreaks, manifesting themselves by opposition to their progress and the destruction of their works, whenever the location of their roads, or their depots, or any of their numerous and necessary operations, came in conflict with the interests of particular localities. These corporations should be the last to consent that the government should be enfeebled by the diminution of its revenues, or to ask that it should be bound to exert all its energies, and incur large and constant expenditures for their protection, while they are exempt from contributing their share.

These principles are not so infirm as to stand in need of the staff of authority for support. They are the result of that liberty and equality which was established by the revolutionary struggle of our ancestors. They are perfectly understood by every one who has capacity to comprehend the nature of our free institutions; they are deeply impressed on the hearts of the people; and they are fully recognised by the history, the objects, and the language of our state constitution.

The case of New Jersey v. Wilson, 7 *Cranch* 161, is cited in opposition to this doctrine. It was decided without argument on the part of the state. It has relation altogether to the power of the colonial government by treaty with a remnant of a tribe of Indians, who released lands claimed by them in consideration of the grant of other lands free from taxation. The Indians occupied

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

in some respects the condition of a separate nation.  Nations are frequently obliged for the sake of the public peace to make concessions to each other which could not be justified if the transaction were between a state and individuals; and the rules which govern in the construction of the treaty-making power do not apply to ordinary contracts.  But it is a sufficient answer to this case to say that the powers of the colonial government of New Jersey, before our free governments were established by the revolution of 1776, furnish no rule whatever for ascertaining the powers of the legislature of Pennsylvania under our present constitution.

In the case of Gordon *v.* The Appeal Tax Court, 3 *How.* 142, it was "admitted by the attorney-general of the state of Maryland, that there was a contract between that state and the banks, and that it was protected by the Supreme Court of the United States."  The question of the constitutional power of the legislature to contract away the taxing power was therefore neither raised nor decided; if it had been, the question would have had relation to the powers conferred by the constitution of Maryland, and not to those granted by that of Pennsylvania.

The case of Hardy *v.* Waltham, 7 *Pick.* 110, was that of an exemption granted by the old colonial ordinance of Massachusetts of 1650, and subsequently confirmed by the people in their state constitution.  A decision affirming the power of the people, when establishing their constitution, to confirm an exemption from taxation granted to a college by an ancient colonial law, has nothing whatever to do with the question involved in this case.  That the people themselves possess this power has never been doubted.  All power emanates from them.  But it is denied that they have in this state granted any such power to the legislature.

In Atwater *v.* Woodbridge, 6 *Conn. Rep.* 223, and in Seymour *v.* Hartford, 21 *Conn. Rep.* 481, the question of the right of the legislature to contract away the taxing power, so as to bind future legislatures, did not arise, because the subsequent enactments were not construed or understood as a repeal of the exemption, previously granted.  The intimations of the judge in delivering the opinion in the last-mentioned case, that such a power had been judicially sanctioned, go for little, particularly when we see that he deplores the exercise of such "a high act of legislative power," and declares the intention of the court "not further to extend this exemption from taxation."  The progress of the age and the experience of government enables it to see and correct the errors committed during its youth and inexperience.

In Brewster *v.* Hough, 10 *New Hampshire Rep.* 138, it was held that "the power of taxation is essentially a power of sovereignty or eminent domain," and Chief Justice PARKER, in delivering the opinion of the court, questions the power of the legislature to make a contract by which it shall be surrendered, without

express authority for that purpose in the constitution. He held that there is a material difference between the right of a legislature to grant lands, or corporate powers, or money, and a right to grant away *the essential attributes of sovereignty.* These, he adds, do not seem to furnish the subject-matter of a contract. In these views we fully concur. The attribution of power by the states to the Union is not in conflict with this principle, for the act of Union is but an enlargement of the political society for certain described purposes, and the power of taxation that passed to the federal government was but a natural and necessary sequence of it. It was not extinguished by contract, but merely transferred to another portion of the government, to be *exercised* for the general welfare under the limitations prescribed.

In general the state courts have avoided expressing an opinion on this momentous question, where the necessities of the case did not require it. The cases which have arisen have generally been disposed of by holding, that " exemptions are binding until repealed by subsequent legislation"—that " no charter or grant carries with it such exemption unless clearly expressed"—that " the taxing power is of vital importance and is essential to the existence of government"—that it is " a part of the power of legislation"— that " it resides in a government as part of itself," and that " the release of it is never to be assumed." Most of these principles are announced by Chief Justice MARSHALL in The Providence Bank *v.* Billings, 4 *Pet.* 561, 562, 563, and recognised by many decisions in this and other states : 10 *Barr* 442 ; 12 *Harris* 232 ; 10 *Harris* 496. But the question has been distinctly decided against the existence of any such power, five different times by the unanimous judgment of all the judges of the Supreme Court of Ohio : Debolt *v.* The Ohio Life Insurance and Trust Company, 1 *Ohio State Rep.* 563 ; The Toledo Bank *v.* The City of Toledo, *Id.* 623 ; Mechanics' and Traders' Branch Bank *v.* Debolt, *Id.* 591 ; The Milan and Richland Plank Road Company *v.* Husted, 3 *Ohio State Rep.* 578 ; The Norwalk Plank Road Company *v.* Husted, 3 *Ohio State Rep.* 586. In one of these cases it was declared that the legislature had not the constitutional authority to abridge, or in any manner whatever surrender any portion of the right of taxation, and that this question had been settled by solemn adjudication, and is not now an open question in that state : 3 *Ohio State Rep.* 581. It is true that the Supreme Court of the United States has taken a different view of the question, and has in several cases reversed the decisions of the Supreme Court of Ohio : Piqua Bank *v.* Knoop, 16 *How.* 369 ; Mechanics' and Traders' Bank *v.* Debolt, 18 *How.* 380 ; Same *v.* Thomas, *Id.* 384 ; Dodge *v.* Woolsey, *Id.* 331.

The decisions of the Supreme Court of the United States, on the construction of the constitution or laws of the United States,

are binding on the state courts. The decisions of the supreme courts of the several states, on the construction of the constitution and laws of their respective states, are, in like manner, binding on the Supreme Court of the United States. That court has no more right to overrule a judgment of a state court, on a question of state law, than the state court has to overrule the United States court on a question of United States law. All contracts are to be construed and understood according to the law of the place where they are made and to be performed. The laws and constitution of a state are to be construed and understood everywhere according to the judicial construction which they receive in the state where they are made and are to operate. This is the rule of jurisprudence which prevails universally throughout the civilized world. It is the rule which always ought to govern, and which generally does govern the Supreme Court of the United States. Wherever there is a departure from it, the necessary result is to impair public confidence in that exalted tribunal, and to introduce disastrous confusion into the administration of the law. It cannot be expected that the judges of the federal court should be as familiar with the constitution, laws, and usages of Ohio, as the supreme judges of that state, who reside within her limits, who have been chosen on account of their acquaintance with her laws, and whose especial business it is to expound them. The decision of the highest judicial tribunal in a state, on the construction of the state constitution, or a state law, is authoritative everywhere, when the same question arises, because it is pronounced by the only tribunal having direct and immediate jurisdiction over the question. The decision of the United States court, on the same point, where it incidentally arises, is not authority elsewhere, because it has no direct and immediate jurisdiction over the question. Its duty is to receive the state law as it is expounded in the tribunal of the last resort in the state. These views furnish a plain rule for estimating the value of the conflicting decisions which have been cited. We have no hesitation in adopting the decisions of the state courts, on all questions respecting the meaning of their own state constitutions, and the extent of the powers which the people of the states have therein granted to the different departments of their own state governments. It may be added that the United States court was divided in opinion on this question, three eminent judges of that court dissenting, while the state court was unanimous. And it is but just to say, that the opinion of the state court is sustained by a course of argument which has never been satisfactorily answered in the United States court, or elsewhere.

Chief Justice TANEY, in maintaining the opinion of the United States court, admits that that court "*always* follows the decisions of the state courts in the construction of their own constitution

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

and laws;" but he adds that "where those decisions are in conflict, the United States court must decide between them;" and he then puts the decision on the ground that the alleged contract was made "under a construction in favour of its validity which had been undisputed for nearly fifty years by every department of the government, and supported by *judicial* construction:" 16 *How.* 431. If these were the facts of the case we find no fault with the decision, except that the *state* court and not the *federal* court was the proper tribunal to pronounce it. We have no sympathies with states or individuals who desire to break engagements entered into with their agents, on the ground that the latter have transcended their authority, after the principals, by acquiescence and encouragement, have induced unsuspecting parties to enter into such engagements and invest their money on the faith of them. Common justice requires every principal to disavow the act of an agent who exceeds his authority, the moment it is known. But, in the case now before us, there has been neither encouragement nor acquiescence. The unauthorized act is openly and promptly disavowed and opposed, in the mode pointed out by the constitution and the laws, the moment that an attempt is made to give it the *form* of a contract.

It is objected that the governor is not subject to this form of our jurisdiction. It is far from our intention to claim the power to control him in any matter resting in executive discretion. But the rule of law seems to be, that when the legislature proceeds to impose on an officer duties which are purely ministerial, he may be coerced by *mandamus* or restrained by injunction, as the rights of the parties interested may require. In such a case no individual in the land, however high in power, can claim to be above the law. This rule is sustained by the cases of Marbury *v.* Madison, 1 *Cranch* 137; Griffith *v.* Cochran, 5 *Binn.* 87; Commonwealth *v.* Cochran, 6 *Binn.* 456; Commonwealth *v.* Cochran, 1 *S. & R.* 473. It seems to us that the sale of the property of the state at auction, is not a part of the governor's constitutional duty as chief magistrate. It is very probable that the legislature have no power to impose any such duty upon him. But, if he consents to perform a ministerial act, the judicial power to administer justice and to restrain against acts contrary to law, cannot thereby be arrested or evaded. And if it be shown that the act under which he claims authority to dispose of the public property or to divest private rights, is unconstitutional and void, he may of course, like any other individual, be restrained from proceeding. But we have too much respect for the office to resort to this measure unnecessarily, and quite too much respect for the incumbent, to suppose that any such proceeding will be necessary after the opinion of this court is pronounced.

There is no constitutional objection to the repeal of the tonnage

VOL. VI.—3

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

tax, or any other tax, whenever the legislature, in the exercise of their discretion, shall think proper to pass such a law. The objection is to the sale of the taxing power in such a way as to put the resources of the state out of the reach of future legislatures, should the public necessities require a resort to them.

There is no legal objection to the sale of 'the Main Line, nor to the right of the Pennsylvania Railroad Company to become a competitor and purchaser, upon equal terms with every other person or corporation. The objection is to that part of the *proviso*, in the 3d section of the Act of 16th May 1857, which requires the Pennsylvania Railroad Company to bid $1,500,000 more than any other bidder, and *in consideration thereof*, proposes to release the said company, and also the Harrisburg, Portsmouth, Mount Joy, and Lancaster Railroad Company, for ever, from the taxes therein stated. The injunction is to be awarded merely to prohibit a sale of the public works, *upon these terms*. All other parts of the act are constitutional, and there is nothing to prevent a sale to the Pennsylvania Railroad Company, or to any other corporation, or person or persons, under the *general* provisions of the act.

WOODWARD, J.—What I think about the questions in these causes, is expressed in the opinion of the chief justice so much better than I could express it, that I file no opinion.

LOWRIE, J.—It is proposed by the Act of Assembly in question to alienate a portion of the state improvements, and with them a portion of the taxing power of the state; and we are of opinion that tax-payers and the officers having charge of those improvements have such an interest as entitles them to raise the question of the validity of the act; and I know not why any fault should be found with Mr. Mott for having, out of abundant caution, purchased a share in the state debt, and three shares in the stock of the company, in order to increase his interest, and more certainly to secure his title to a hearing.

These cases raise the question,—Is the Act of Assembly constitutional? and it is so important, that I may be indulged in a very brief expression of opinion upon it, in the form which it has taken in my own mind; notwithstanding the very thorough treatment it has received from my learned brother, the chief justice.

It involves the question,—What is a constitution? That of the United States is peculiar in its character; for by it a political society was both constituted and constructed; separate and independent states were, by that act, constituted one, for certain specified purposes, and a frame of government was constructed as a means of carrying out those purposes. It extends the political society, and institutes a government to maintain it.

State constitutions are of a different character; for they merely

construct forms of government for political societies already constituted and existing.　They are forms of government prescribed by the people of the respective states to the authorities instituted by them.　All the departments of government are instituted to exercise the functions of government for the common good, and the constitution distributes those functions among them.

This attribution and distribution of authority is made by the people, not as a gift that may be disposed of and put beyond their reach; but as a trust to be exercised for their benefit as occasion may require: not that it may be abandoned or bargained away at the discretion of their agents; but that those agents may act for the people, in administering it.　It is an attribution and distribution of authority for exercise and administration, and nothing more.　In the nature of things, it is impossible to imply an authority in governmental agents to diminish the governmental power that is naturally inherent in the people that constitute them.　The people's power is not parted with by the institution of government, but only delegated; and this delegation, being essentially revocable, cannot possibly authorize an act that will prevent its complete revocation.

As individuals must, in the nature of things, have certain inherent and inalienable rights, in order to be individuals; so society must have its inherent and inalienable rights, in order to be a society.　This is a natural and scientific necessity.　The social right and power of government is essentially inherent and inalienable, because man is naturally social, and there can be no society without government.　As social right and power, they are, in no sense, alienated by extending the limits of the political society, and admitting others to participate in its regulation, as we did when we joined in constituting the United States.

Now the right and power of society to demand that each of its members shall contribute his just proportion to the common necessities is a natural and inalienable right, for without it there can be no organized society.　This is one of the most essential of all the rights of a state, for on it all its other powers depend, and the taxing power is one of its most obvious forms.　Society cannot alienate it without abandoning its social functions, and thus destroying itself.　It is not alienated nor put in a position to be alienated by the institution of government; but only delegated for exercise and administration, and government can do nothing else with it.　It is intrusted for this purpose and for no other; and the discretion, which is necessarily allowed in the exercise of the power, is very plainly not a discretion to part with the power itself.　No single element of it can be alienated by those who are intrusted merely with its administration; but they must preserve it entire, and be prepared to restore it so, at the termination of their stewardship, and when the hour of revocation comes.　The

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

social right and power of preserving order, and of punishing breaches of it, so plainly falls within the same category, that we are not called upon to give it any special consideration; and we do not perceive that it was intended to be violated in this case. It seems to me very plain that the legislature exceeded its authority when it undertook to bargain away a portion of the taxing power committed to its trust. A simple law exempting any specified property from taxation, is not liable to this objection, for such a law may be repealed at any time, and therefore does not impair the taxing power.

And it is of the utmost importance to the state and to this company that this question should be met and decided in this preliminary stage of the proceeding, and before it can be said that any money has been invested on the faith of this legislation. It is best to be decided now and here, for it is a question of the interpretation of our state constitution, and our own state authorities are the only ones entitled to speak in the name of the people, and to bind them by declaring its meaning. At a later stage of the proceeding, rights might be claimed to have vested under this law, and the question might be carried before the Supreme Court of the United States, which cannot be expected to study our state constitution as carefully as it must be studied by our own authorities.

Before that court, it would come up as a question, not of United States law, but of state law, of *lex loci rei gestæ*, as it is technically called, and they might readily mistake its interpretation. It would be their duty to interpret it according to the best of their ability, and their decision would be the law of the case. They would not interpret our law or our constitution differently from what they know it to be understood by our own authorities; for this would be like the imposition of a law upon us by those whom we have not appointed for that purpose, which would be nothing less than usurpation, and is, therefore, not supposable.

If a transaction, originating in Ohio, should come up for trial before our courts, it would be judged by the law of Ohio, and our understanding of that law would necessarily be the rule of the case, though it should be a misunderstanding; but our mistake would be confined in its consequences to that case, and would not affect the law. We are in no sense responsible for the laws of Ohio, and we would not attempt to mould them into conformity with our notions of right and wrong. Here, however, a mistake by the Supreme Court of the United States might lead to a vast expenditure of money on a matter that *could* not stand the test of our law; or it may be supposed possible that that court would decide, and persevere in the decision, that our state had bargained away the power of taxation irrevocably, either of which results might have a most disastrous influence. We avert the danger by

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

deciding now and here that this law is unconstitutional, so far as it offers to bargain away the taxing power of the state, and so far we resist its execution.

KNOX, J.—The General Assembly, by its Act of 16th May 1857, offers for sale the Main Line of the Public Works. The third section of the act makes it lawful for any person or persons, railroad or canal company, now incorporated, or hereafter to be incorporated, by and under the laws of this Commonwealth, to purchase at a price not less than $7,500,000. The same section also provides, that if the Pennsylvania Railroad Company shall become the purchasers, either directly at the sale, or by assignment thereafter, it shall pay at least $9,000,000, in the manner specified in the act; and the Commonwealth will, in consideration thereof, release the company, and the Harrisburg, Portsmouth, Mount Joy, and Lancaster Railroad Company, for ever, from the payment of all taxes upon tonnage or freight, carried over said railroads; and will also release the Pennsylvania Railroad Company from the payment of all other taxes or duties on its capital stock, bonds, dividends, or property, except for school, city, county, borough, or township purposes. The proposition is to sell the Main Line to whoever will pay at least $7,500,000, and to release to the Pennsylvania Railroad Company all taxes now imposed upon it for state purposes, as well as the right to impose any hereafter, provided the company will purchase the Main Line, at a sum not less than $9,000,000.

The complainants, as canal commissioners, and as tax-payers, pray this court to enjoin the agents of the Commonwealth from selling, and the Pennsylvania Railroad Company from buying, the Main Line, upon the terms proposed.

The principal question raised by this motion for an injunction, is this: Can the General Assembly bind itself, and its successors, for all time to come, not to exercise the power of taxation upon the business or property of an incorporated company?

All legislative power is by the constitution, vested in the General Assembly, except where it is, either in express terms, or by necessary implication, withheld. There are no words in the constitution which expressly declare, that the legislature shall not relinquish the power to impose taxes upon persons or property, nor is such prohibition to be necessarily implied from any of the restrictions imposed upon legislative action; but unless the power to part with the right to tax, passed to the General Assembly by the grant of legislative power, it does not exist, although not forbidden. It is difficult, if not entirely impossible, to define with precision in what the legislative or law making power consists; but it is very clear that it is not an absolute power to do whatever the General Assembly may determine to do; for, if it were, there

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

would practically be but one department of government instead of three; or, at least, the executive and judicial departments would be at the mercy, and under the control, of the legislative department; and our much valued system of checks and restraints completely destroyed.

The power to impose taxes is entirely legislative in its character, and the General Assembly is possessed of this power to the fullest extent; for it was conferred by the people without restriction or limitation. It was conferred, however, to be used as the exigencies of the government required, and not to be bartered away to answer present purposes at the expense of the future. The power to impose taxes does not include the power to grant immunity from taxation, any more than the power to provide punishment for the commission of crime implies the power to grant exemption from all punishment. To deduce the right to contract the power away from the right to exercise it, is to claim the right to destroy, because the right to preserve is conceded.

The power of taxation, for the purpose of raising a regular and adequate revenue to defray the expenses of the government, is indispensably necessary to the very existence of the government; and if it may be contracted away in part, it may be in the whole, and the government thereby destroyed. I have already said that the power of taxation was given without stint or restraint by the people to their representatives; not to the General Assembly of 1857 alone, but to its successors, as well as its predecessors. Where, then, did one legislature obtain the power to lessen or weaken that to be exercised by the next? If particular property can be placed outside of the power of the government to reach it for taxation, particular persons may be in a like manner privileged, and so may classes of persons, or those holding to a particular religion or political faith; suppose the General Assembly should declare that all taxes should be assessed upon the persons and property of the members of a certain political party, and that that the persons and property of all others should be, for all time to come, released from taxation; would any one doubt but that here would be an excess of power? Probably not; and yet in principle it is difficult to conceive how the extent or form of the exemption, can vary the question of constitutional right. I do not deny the power of the legislature to exempt particular property from taxation with or without consideration, or to select objects of taxation; but I do most distinctly affirm, that such legislative acts of exemption, as well as those of selection, may always be amended or repealed by subsequent legislation. The proposition contained in the bill under consideration, is not simply to release taxes already imposed, and thereby undo what former legislation has done; but it is to exhaust the power to assess taxes upon the tonnage of the Pennsylvania Railroad Company, and

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

upon any property now owned or hereafter to be owned by that company, no matter what the value, character, or extent of the property, nor what the exigencies of the government may be.

In denying to one legislature the right or power thus to bargain away the sovereignty of the people of this Commonwealth, to any person or persons, natural or artificial, we do not cripple the legislative department of the government; but we preserve unimpaired one of the most essential attributes of legislative power vested by the people in the General Assembly.

A contrary doctrine would not only tend to weaken, and ultimately to destroy the rightful powers of the General Assembly, but it would also greatly trench upon the inherent power of the people themselves; for, if such a contract can lawfully be made, its obligation will remain, despite legislative enactment or constitutional mandate. The thorough examination which this question has received at the hands of my brethren, dispenses with the necessity of further discussion. But it is said that the complainants, neither as tax-payers, nor as canal commissioners, have such an interest as to justify their complaint being listened to; and it is also alleged that the question is prematurely raised.

The right of the complainants, both as tax-payers and as canal commissioners, to call in question the constitutional power of the legislature to make the proposed contract, has been sufficiently shown in the opinions just read; and it appears to me to be very plain that the question is not only a material one, but that this is the very time to have it presented and determined. A contract is about to be made upon the faith of an Act of Assembly; and if made, will affect interests of great magnitude. Its execution involves the sale and delivery of property belonging to the Commonwealth of immense value; no part of which can be abandoned, or perverted from its accustomed use, without producing the most injurious consequences. It also involves the creation of a debt, on the part of the Pennsylvania Railroad Company, of at least nine million dollars; the incurring of which debt, it is evident, would be induced, in a considerable degree, upon the faith of the release of the taxing power. If the proposed contract is incapable of full execution, and of entire performance by both parties, the plainest principles of common justice require, that it should be so declared before any one has been misled by it. Again, the proposition to sell the right to tax particular property is now made for the first time in the history of Pennsylvania legislation; and the sooner that it is known that no such contract can be made by either or all of the departments of this government, the better it will be for the parties to this bill, and for every citizen of this Commonwealth. The sooner a question like this is met, the easier it is to dispose of it. There is now no claim of vested rights, nor of abused confidence. A great principle can

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

be vindicated without prejudice to any interest. One department of the government has mistaken its authority; to prevent the ruinous consequences which would certainly follow from acquiescence in the mistake, the power of this court is invoked; and, however great our respect for the immediate representatives of the people, we must pronounce the law as we believe it to be, though by so doing we may declare as unauthorized and void an act of a co-ordinate branch of the government. Nor can we shelter ourselves behind the decisions of the Supreme Court of the United States; for that tribunal is utterly powerless to prevent the mischief here complained of; and to it the people of Pennsylvania have never committed the right to determine, whether their representatives could bargain away one of the most essential powers of government.

Happily for those by whose authority we sit in judgment, and in whose name we act, the decree now made will prevent any contract for the release of the taxing power from being executed; and therefore there will be no occasion, hereafter, to inquire whether future legislation impairs the obligation of such a contract. The question involves the power of a Pennsylvania legislature under a constitution made by the people of Pennsylvania; and it must be decided by the judicial tribunals of the state of Pennsylvania, upon whom the responsibility of the decision alone rests. It is said that the effect of this injunction will be to lessen competition in bidding for the public property about to be offered for sale. Even were this so, it would not affect the question of the constitutionality of the law under which the sale is proposed to be made; but, instead of lessening competition, the injunction about to be issued will unquestionably promote competition, by placing all who desire to purchase upon an equality.

We do not pronounce the entire act unconstitutional, nor do we prohibit the Pennsylvania Railroad Company from purchasing the Main Line, upon precisely the same terms and upon the same conditions as any other railroad or canal company, person or persons, may purchase. Everything which relates to the special contract proposed to be made with the Pennsylvania Railroad Company, is so connected with the proposition to release the power of taxation, that it must stand or fall together; and consequently there is no validity in any part of this branch of the bill, and the act is to be read as though it had never been inserted. The effect of the act will then be, that the governor of the Commonwealth may, on the day now fixed, or hereafter to be fixed, sell the entire Main Line of Public Works to any railroad or canal company of this Commonwealth, or to any person or persons, for the highest price bid for the same, not less than seven and a half million of dollars, under the general terms and conditions provided for by the act. If the Pennsylvania Railroad Company shall be the

highest bidder, at a sum exceeding the minimum, and complies with the other conditions mentioned in the act, she will become the owner of the Main Line; but, whether this is accomplished or not, the taxes now imposed upon that corporation, as well as its liability to such further taxation as future legislation may impose upon its business or property, will remain intact; and it will be subject in this respect, like other corporations, to the control of that power to which it owes its creation.

ORDER.—It is ordered that, upon the complainants, or either of them, filing a bond in the penal sum of $1000, with sufficient sureties, to be approved by this court, or any judge thereof, conditioned to indemnify the defendants from all damages that may be sustained by the injunction granted on this motion, an injunction be awarded, commanding the Pennsylvania Railroad Company, and its officers and agents, named as defendants in this bill, to make no bid for the purchase of the Main Line of the Public Works under that part of the proviso in the third section of the Act of 16th of May, 1857, which requires the said company to pay, in addition to the purchase-money at which the works may be struck down, the sum of $1,500,000, and in consideration thereof assumes to discharge for ever the said railroad company, and also the Harrisburg, Portsmouth, Mount Joy, and Lancaster Railroad Company from the payment of all taxes upon tonnage and freight over said railroads; and also to release the said Pennsylvania Railroad Company from the payment of all other taxes or duties on its capital stock, bonds, dividends, or property, except for school, city, county, borough, or township purposes. And also commanding the said Pennsylvania Railroad Company, and its officers and agents aforesaid, strictly to abstain from accepting any assignment on the terms stated in the aforesaid part of the said proviso, or executing or delivering to the treasurer of the state any bonds of the said company, for any greater amount than the sum at which the Main Line of the said Public Works may be struck down at a public sale, on a fair and equal competition with all other bidders. And also commanding the said Pennsylvania Railroad Company, and its officers and agents aforesaid, strictly to abstain from accepting any transfer of the said Main Line of the said Public Works from the secretary of the Commonwealth, under the great seal of the state, founded upon or in consideration of any purchase upon the terms herein prohibited. And also commanding Henry S. Magraw, the treasurer of the state, strictly

[Mott *et al. v.* The Pennsylvania Railroad Company *et al.*]

to abstain from accepting the delivery of any bonds executed by the said Pennsylvania Railroad Company upon the terms herein prohibited, or for any greater amount than the sum at which the said Main Line of the Public Works may be struck down at a fair public sale of the same, upon equal terms to all persons and corporations desiring to purchase. And also commanding Andrew G. Curtin, secretary of the Commonwealth, strictly to abstain from making any transfer of the said Public Works, under the great seal of the state, upon the terms herein prohibited, or for any greater amount than the sum at which the said works may be struck down, at a fair public sale as aforesaid. This injunction to remain in force until hearing, or the further order of this court.