## Erie v. McAllister & Son

*Gerald J. Weber*, and *Knox, Weber, Pearson & McLaughlin*, for plaintiff.

*John M. Wolford, Edward H. Carney* and *Dunn & Wolford*, for defendant.

LAUB, J., May 3, 1963.—This is a proceeding for a declaratory judgment to determine who bears the obligation to make repairs to a pier in Presque Isle Bay. The essential facts have been agreed upon by stipu-

lation, but to impart meaning to our judgment we make the following findings of fact:

## Findings of Fact

1. Plaintiff is the City of Erie, a municipal corporation in the County of Erie and State of Pennsylvania; and it brings this action by and through the Port Commission of the City of Erie, the official agency of the City of Erie established by an ordinance of the City of Erie to manage the piers, docks and waterfront facilities of the City of Erie.

2. Defendants are R. D. McAllister & Son, a partnership, having its office and place of business at East Bay Front, in the City of Erie, Erie County, Pa., and Irene Markopolos, an individual residing at 133 East Twenty-Ninth Street, Erie, Erie County, Pa.

3. Defendant R. D. McAllister & Son is the owner of Outshore Water Lots Nos. 65 and 66, in their entirety, and parts of Outshore Water Lots Nos. 67, 68 and 69, in the City of Erie, County of Erie and State of Pennsylvania, all as more fully described in the deed of John L. Coates, Sheriff, to R. D. McAllister & Son, a partnership, dated December 4, 1959, in Sheriff's Deed Book 811, page 366, in the Office of the Recorder of Deeds of Erie County, Pa.

Defendant's predecessors in title to the above-described real estate, inter alia, were Frederick G. Shaw, single, and Louis W. Courtney and Mary Courtney, his wife, although said sheriff's deed was pursuant to an action of foreclosure by the mortgagee bank on the mortgaged land, approved by the Court of Common Pleas of Erie County.

The deed from the Sheriff of Erie County to R. D. McAllister & Son, supra, contained the reference copied from the mortgage, which was copied from the prior deed, "It being intended by Deed recorded in Erie County Deed Book 456, page 255, that first party shall become the owner of all of Out Shore Water Lots 67, 68

and 69, excepting only those portions thereof heretofor conveyed by Frederick G. Shaw to the City of Erie and to Tony Markopolos, including also all wharf rights incident to said Water Lots and the land covered thereby."

4. The property of R. D. McAllister & Son is utilized in its business for the sale and servicing of yachts and commercial vessels and supplies therefor.

5. On April 20, 1939, Louis Courtney et ux. and Frederick G. Shaw, single, conveyed to the City of Erie a portion of Outshore Water Lot No. 69, by deed recorded in Erie County Deed Book 397, page 59. In said deed the grantors expressly reserved "all existing rights and privileges relative to docking of ships and other water front rights along the north side of said Water Lot."

6. On June 15, 1939, Frederick Shaw, single, conveyed to Tony Markopolos, a portion of Outshore Water Lots Nos. 67, 68 and 69. In said conveyance there was expressly reserved all wharf rights inhering to the property conveyed, in consideration of which it was agreed that the grantor for himself and his heirs and all persons who through him become owners of the remaining portions of Outshore Water Lots Nos. 67, 68 and 69, then owned by grantor, who may have occasion to use said wharf rights in the conduct of their business (that he and/or they) will pay and save second party harmless from any and all assessments, taxes and other sums which may be or become chargeable against the therein described premises or against second party for or on account of the maintenance, repair or renewal of the 20-foot wharf adjacent to said property along Presque Isle Bay and/or the retaining wall, piling or cribbing which supports the same. It was expressly stipulated that the above agreements shall become covenants running with the land and binding upon all persons into whose hands same may come. Said prop-

erty was conveyed by Tony Markopolos, and his wife, to themselves as tenants by the entireties by deed recorded in deed book 795, page 170. The said Tony Markopolos has since died leaving title to Irene Markopolos, his surviving widow, defendant herein. The property of Irene Markopolos is utilized as the location for a restaurant business.

7. By Act of Assembly, March 29, 1805, P. L. 476, 478, sec. 6, the General Assembly of the Commonwealth of Pennsylvania granted to the Burgess and Town Council of the Borough of Erie general authority to erect public wharves and landings, to lay out and sell water lots on the bayfront opposite the borough, and to convey fee simple title to the purchasers of said lots, along with the right of erecting wharves opposite their lots, and to extend as far out into the bay as the borough laws would permit.

8. By virtue of said Act of 1805, water lots 33 feet in width were laid out under a Resolution of the Borough Council of November 7, 1807, and sold to bidders on November 15, 1807. Water lots nos. 65 and 66 were sold to Rufus S. Reed, nos. 67 and 68 to Judah Colt and 69 and 70 to Amos Fisk, these being predecessors in title to defendants and to plaintiff in that portion of lot no. 69 mentioned in finding of fact no. 5.

9. By the Act of April 15, 1834, P. L. 520, the Burgess and Town Council of the Borough of Erie were given power, subject to the Commonwealth's right of revocation, to enact ordinances for the preservation of the canal basin then being erected in the Bay of Presque Isle, the pier work thereof, and all public bridges, wharves and other appendages and constructions connected therewith, and for regulating the manner in which the same may be used by the public, with such restrictions, prohibitions and penalties as shall appear conducive to the public interest and welfare of the Commonwealth.

10. Acting pursuant to the aforesaid acts, the Burgess and Town Council of the Borough of Erie entered into an agreement with the several owners of the water lots in front of the Borough of Erie to regulate the construction of piers, the length of same and to provide for the preservation of the canal basin and the public pier which forms it. By its terms, this agreement was to bind the said owners and their heirs and assigns. This agreement will hereafter be referred to as the 1837 agreement.

11. That in said 1837 agreement following the granting paragraphs are the paragraphs enumerating the covenants or obligations of the water-lot owners or purchasers, the first of which was an obligation of the water-lot owners to create or build a new public pier on the north side of Commercial Street a distance of 182½ feet from the north side of the then existing Water Street. That paragraph second of the 1837 agreement set forth the covenant of the water-lot owners to pay "such reasonable assessments and taxes as may be assessed on their respective lots for the purpose of keeping the public pier and bridge in repair."

12. That by reason of difficulties in interpretation of the 1837 Agreement, the Burgess and Council of the Borough or Town of Erie on September 12, 1846, and the water-lot owners entered into a second agreement affecting said water-lot rights, duties, privileges of the public, the Borough of Erie and the owners, which will hereafter be referred to as the 1846 agreement, the same being recorded on September 25, 1849, in Erie County Deed Book No. "U," at page 565.

13. The reference in the 1846 agreement to the "Third Item" of the covenants of the first party is erroneous as obviously the parties were, in fact, referring to the reservation in the paragraph enumerated "Fifth."

14. That after said 1837 and 1846 agreements the water-lot owners did wharf southwardly into the canal basin, or fill in the same, to the allowed distance, or generally or substantially said distance, and that the land formed thereby contains those areas formerly covered by waters of Presque Isle Bay or the canal basin known as outshore water lots. That the titles or ownership of the filled areas or outshore water lots have long since and for many, many years generally become divided or separated from the titles or ownership of the original water lots which included what are now referred to as the inshore and the outshore water lots.

15. That R. D. McAllister & Son and Irene Markopolos and prior owners of the water lots, whether inshore or outshore water lots, have for many, many years, in fact, paid real estate taxes on the basis of the land or fill being the wharves south of the Public Pier which constitutes the East and West Bay Fronts and the buildings thereon, not only for the land actually occupied by said owners, but the land over which also there are easements, being the 30 feet adjacent to the 20-foot pier itself on which buildings are prohibited on ground level. That the annual City of Erie tax upon R. D. McAllister & Son for the property in question and the adjoining outshore water lots owned by it is now in excess of $3,100, and on Irene Markopolos now in excess of $230, exclusive of other real estate taxes being for the County of Erie and School District of the City of Erie. There has been no billing for or payment of the annual $6 charge per lot for bridge maintenance, although defendants offer the same and are willing and able to pay the same amount. That the taxes paid by R. D. McAllister & Son, and Irene Markopolos, unto the City of Erie, without even considering the taxes of the respective numbered inshore water-lot owners, are far in excess of the amounts necessary to keep the public

pier fronting each lot in the highest degree of maintenance and repair, and a similar situation exists with the other outshore water-lot owners, although they are not directly involved in the within litigation.

The said taxes referred to herein are the general real estate taxes imposed by the City of Erie on all real estate at its assessed valuation, and were in no wise special assessments for a particular purpose.

16. The portion of the public pier known as the East Public Dock, or East Bay Front fronting water lots nos. 65, 66, 67, 68 and 69, is in a serious state of disrepair and decay and portions of the same have broken away and fallen into the waters of the bay.

17. That the northerly 20 feet of said public pier is owned by the public, and is the original public pier, as improved. That the contiguous 30 feet to the south, although taxed to the outshore water-lot owners, is subject to certain technical easements in favor of all the outshore water-lot owners, and possibly the public.

That the nature of said ownership and easements has been partially adjudicated in Walker v. Erie, 64 Pa. Superior Ct. 525, and Reed v. Erie, 79 Pa. 346.

That the area of decay, erosion, or washout is increasing in size, and while still limited to the north 20 feet of said public pier, is progressing from the north edge or face of said pier extending from the bay bottom to the topside, is a serious threat to the contiguous 30-foot strip and is becoming a threat to the buildings of defendants next contiguous thereto.

That while said erosion and washout have become visible during the past year, by the collapse of the north face of said dock, said decay is probably the result of no maintenance or repairs by any party at this place for a number of years.

That defendant R. D. McAllister & Son has repaired or refaced other portions of the said public pier fronting other property owned by it located eastwardly from

the outshore water lots which form the basis of the complaint.

That from time to time other owners of outshore water lots abutting or adjoining said public pier have repaired or restored the portion of the public pier fronting their property at their own cost and expense.

That in 1909, the Commonwealth of Pennsylvania constructed and transferred to the City of Erie the Public Steamboat Landing or Public Dock at the foot of State Street extending north between the east and west public pier; and the Commonwealth of Pennsylvania and the City of Erie, may have, at some time or times in the past, repaired the road surface or the dock face of the east and west public pier in some places.

18. That the area between the buildings now facing said east and west pier, and the northern edge of said dock, is an area of constant public use, for: (a) the movement of vehicles to and from the business establishments located on the outshore water lots facing said pier; (b) for the docking, lading and unlading of vessels of all kinds, pleasure and commercial; (c) for persons of all ages fishing from said pier; and (d) by numerous persons, driving, bicycling and walking, just for pleasure, visiting or sight-seeing.

19. That the various parties to this action have notified one another to make the necessary repairs to said public pier, with defendants or owners denying any liability therefor, and the City of Erie denying any liability therefor.

## Discussion

Ancient landmarks cast long shadows. The seeds of this controversy were sown more than a century and a quarter ago in a contract between the municipal fathers of what was then the Borough of Erie[1] and several of

---

[1] Erie was laid out by Act of April 18, 1795, from lands reserved to the Commonwealth by Act of April 3, 1792. It was made a borough by Act of March 29, 1805, P. L. 476, sec. 1, and became a city by Act of April 14, 1851, P. L. 631.

its citizens. In that instrument, an attempt was made to settle the rights and duties of the parties respecting an enclosure in Presque Isle Bay known as the "canal basin." However, certain phases of that agreement became clouded, and nine years after its execution, a second or clarifying agreement was made between substantially the same parties. As evidenced by the present dispute, at least one aspect of the matter still remained unsettled. In essence, what we are now called upon to determine is the identity of the party responsible for keeping a breakwater pier in repair, and since our decision must hinge upon the two ancient contracts mentioned above, it is necessary that we examine the circumstances under which they were born: Pritchard v. Wick, 406 Pa. 598, 602; United Refining Company v. Jenkins, 410 Pa. 126, 137-38. To some degree, therefore, the early history of the Erie waterfront and the history of this litigation run parallel.

Prior to 1805, Erie was a small settlement on the southern shore of Presque Isle Bay, a natural harbor created by a peninsula which juts from the mainland northeasterly into the waters of Lake Erie.[2] At that time, shipping was relatively extensive, and a number of wharves, warehouses and docks had been constructed along the shoreline, but the waters and underlying land belonged to the Commonwealth in trust for the people, subject, of course, to the Federal government's paramount rights in navigable waters. Evidently for the purpose of promoting shipping, the legislature in 1805 incorporated the Town of Erie into a borough[3] and

---

[2] Early references to Presque Isle sometimes call it an island because, at times, there was a westerly passage to the lake across the peninsula neck.

[3] Act 1805, supra. The first borough limits ran from Parade Street on the east to Chestnut Street on the west, about eight city blocks, and from Twelfth Street on the south to Front Street on the north, about 12 city blocks.

authorized its burgess and council to lay out a row of lots in the bay opposite the borough and sell the same at auction, giving a fee simple title.[4] In pursuance of this act, the borough officers by resolution adopted November 7, 1807, laid out the lots, which were outside the borough limits, and later sold them, defendants' predecessors in title being purchasers at said sale. As provided in the legislative authorization, the proceeds of the sale were to be used to erect streets, wharves and landings in the bay, and the borough officials were to make regulatory rules and orders with respect to the same.

Shortly after the sale of the lots (hereinafter called "Inshore Water Lots"), the Erie Extension Canal was in contemplation and speculation grew concerning its effect upon Erie shipping. By the time the first contract was executed in 1837, the canal had become a definite project and construction had begun.[5] A breakwater pier had been built 1,200 feet out into the bay to provide a shelter or basin for canal and other boats bringing goods into the area.[6] Funds for this construction were derived from the sale of other Commonwealth lands outside the borough limits under an act passed April 8, 1833, P. L. 243, which authorized the burgess and town council to sell the land in the same manner as under the 1805 Act and to use the proceeds for the basin's creation. The breakwater pier (hereinafter called the "pier") was 20 feet wide and extended in an

---

[4] The question whether it was legal, in view of the Commonwealth's trusteeship over public domain, to grant a fee in lands covered by navigable waters is not involved here. See Paasch v. Wright et al., C. P. Erie County, September term, 1932, no. 12, in equity; Attorney General's Opinion, 12 D. & C. 88.

[5] The first canal boat arrived in Erie December 5, 1844. The canal was subsequently abandoned in 1871 by the railroad which then owned it: Warner, Beers & Co., History of Erie County, 1884.

[6] Reed v. Erie, 79 Pa. 346, 347.

east-west direction parallel with the south shoreline of the bay. This pier has now become dilapidated and this lawsuit is to determine who must repair it.

State Street, now Erie's principal artery of traffic, terminated at the water's edge opposite the approximate center of the pier, and to afford access from State Street to the breakwater, a causeway or series of bridges was built northwardly from the mainland, dividing the canal basin into two parts connected by a drawbridge.[7] In appearance, therefore, these two artificial structures resembled the letter T.[8] It is the easterly segment of the T's crossbar which occupies our attention.

By the time the pier and causeway had been built, the legislature had extended the borough limits 1,300 feet out into the bay and had conferred authority in the burgess and town council to preserve the basin and its appurtenances and to regulate their use.[9] This was consonant with previous legislative acts granting the same officials regulatory powers in bay-waters opposite the borough, and resulted in giving complete supervisory powers in the burgess and town council over the basin which was now entirely within the borough limits.

It was recognized early that the pier was too narrow to accommodate the loading and unloading of vessels on both the bay and basin side, and that something needed to be done to derive the greatest efficiency from the structure. It was decided to accomplish this by giving the owners of the inshore water lots the right to extend their holdings on the shore side of the basin

---

[7] See drawing on page 349 of Reed v. Erie, supra.

[8] Later, by construction of a public steamboat landing northwardly from the end of the causeway, the T was converted by the Commonwealth into a cross.

[9] See Act of April 15, 1834, P. L. 520.

northwardly across the water, such extension beginning at a point 200 feet south of the pier and extending northwardly to it between the inshore lot lines as extended. This meant that each inshore lot would have a 200-foot counterpart (hereinafter called "Outshore Water Lots") on the opposite side of the basin, said lots having a frontage on the pier to the north and a frontage on the basin to the south, with the waters of the basin between the inshore and outshore segments of the extended inshore lots. The effect of this would be to thicken the width of the T's crossbar by a distance of 200 feet. To put this plan into execution, the municipal authorities and the owners of the inshore water lots entered into the first contract on January 20, 1837. By its terms, the inshore water lots were made longer on the mainland side and the owners were granted certain wharf and dock privileges thereon. The agreement also created the outshore water lots according to plan, gave the lot owners the right to erect platforms or wharves thereon, and created certain easements, one of which was a 30-foot easement of way immediately south of the pier for the convenience of the lot owners. In addition to this, each owner was given the right to use the pier for the loading and unloading of vessels, and to use the causeway leading to the mainland as a public cartway. In consideration of these concessions, the owners agreed to construct additional wharves adjacent to their inshore lots and to pay whatever reasonable assessments and taxes were necessary to keep the pier and the causeway in repair. The municipal officers, on the other hand, agreed not to rent the pier or causeway to others or to permit these structures to become obstructed.[10] It was also agreed that if

---

[10] In construing this portion of the agreement, the Superior Court in Walker v. Erie, 64 Pa. Superior Ct. 525, held that the city officers could charge wharfage to persons using the pier who were not lot owners without violating their covenant not to rent it.

another pier should become desirable to the north of the existing one, the lot owners would cause it to be erected at their own cost.

More than nine years following the 1837 agreement, it was considered necessary to clarify it by a supplemental agreement. By this time the canal was open and the basin was booming with trade. The second agreement became necessary for several reasons. Some of the inshore lot owners had not signed the 1837 contract and some of its provisions could not be enforced for reasons not important to this decision. In addition to this, difficulties had arisen in construing those portions of the 1837 agreement regarding the burgess and council's reservation of the right to impose assessments and taxes to keep the pier and causeway in repair. The second agreement, which was executed September 12, 1846, was expressly designed to remedy these difficulties.

The essential portions of the 1846 contract as they bear upon the matter under consideration are summarized as follows: (1) The lot owners bound themselves, their heirs and assigns to the covenants of the agreement severally and not jointly; (2) in lieu of the reasonable taxes and assessments specified in the 1837 agreement, the owners agreed to put in repair at their own cost so much of the pier as lay in front of their lots, and to keep the same in constant and good repair under the supervision and direction of the borough authorities; (3) if an owner neglected or refused to make repairs after 30 days' notice, the borough officials were accorded the right to make repairs at the owner's cost and to collect the same from the owner as a debt; (4) it was stipulated that the obligation in the owners to keep the pier in repair should be and remain a specific and perpetual lien for all time to come upon each and every lot severally; (5) in addition to the right to collect the cost of repairs made by the borough

officials mentioned in no. 3, supra, they could assess and include the cost of such repairs in the duplicate of the season and collect the amount due by distress as other county [sic] rates and levies are collected; (6) the parties agreed that the covenants of the contract with respect to repairs should constitute a full and complete substitution for the reasonable taxes and assessments mentioned in the 1837 agreement.

From time to time following the last agreement until the inception of this litigation, the owners have kept the pier in repair at their own cost. No special assessments have apparently been made by the borough or its successor city for the purpose of repairing the pier or the causeway, [11] and the municipality has, for many years, levied an annual tax assessment against the lots as in the case of other lands in the city. It should be noted that as the pages of time began to turn, the ownership of the outshore lots became severed from the ownership of the inshore lots and each outshore lot is now assessed as a separate unit independent of its sire on the mainland.

With the above history before us, it is easy to comprehend what the contracting parties were trying to do. The canal basin and the Erie waterfront had become beehives of commerce. Scores of boats were loaded and unloaded daily at the docks and a large number of people derived their living from boating.[12] Dock lands became part of the most valuable property in and around Erie.[13] Thus, in the interest of public economy,

---

[11] At one time the city paved the causeway and attempted to impose a paving lien against adjoining inshore and outshore lot owners, but the Supreme Court in Reed v. Erie, supra, held that the causeway was not a street and that the basin lots were not liable for the paving costs.

[12] History of Erie County, supra, p. 432.

[13] Nelson's History of Erie County, p. 420.

the borough officials were desirous of developing the harbor to the fullest and the lot owners, for themselves, were anxious to further their own shipping interests. The 1846 agreement was not only designed to accomplish these aims, it actually did accomplish them. By expanding the dock facilities and shrinking the basin which, because of its size, had become hazardous to small boats in stormy weather,[14] the public gained large benefits through relatively minor concessions to the lot owners. The owners, on the other hand, acquired valuable property and dock rights on both sides of the basin, and secured a preferential use of the pier on the bay side.

Now with regard to the provisions of the two agreements respecting repairs to the pier: It will be noted that in the 1837 agreement the borough officers reserved the right to levy and collect from the owners of the lots such reasonable taxes and assessments as were necessary to keep the pier and bridges in a state of repair, and the owners agreed to pay such levies. This raises the immediate query whether the taxes and assessments mentioned were taxes on real estate imposed for general borough purposes or whether something else was intended.

It must be noted at once that the Act of April 8, 1833, P. L. 275, which altered previous legislation respecting the Borough of Erie, did not authorize the borough to levy taxes on wharves and landings. Under section 9 of that act, the borough could collect tolls and wharfage thereon but the taxing power was limited to taxation for repairing streets, for owning and keeping dogs and for objects of general utility. The Act of April 15, 1834, P. L. 520, authorized the burgess and town council, until the legislature shall otherwise provide, to

---

[14] The 1846 agreement recites that the basin was unnecessarily large and hazardous to heavily laden canal boats in rough weather.

enact ordinances for the preservation of the canal basin, the pier work thereof, and all public bridges, wharves, and other appendages and constructions connected therewith for the purpose of regulating their use, including such restrictions, prohibitions and penalties as shall appear conducive to the public interest and welfare of the Commonwealth, but the question of taxes for general governmental purposes was not mentioned therein. Thus, there was no specific authority given the borough officials to levy a real estate tax on wharves and landings at the time the 1837 contract was entered into. In fact, there was no general statute respecting the status of wharves as real estate for taxing purposes until the Act of April 29, 1844, P. L. 486, sec. 32, which listed them as real estate for the purpose of taxation to reduce the State debt. Therefore, even though the Act of 1834 had extended the borough limits to include the basin within the borough's taxing competence, there was no specific legislative authority to tax wharves, and in this connection it should be noted that the outshore lots were originally constructed over navigable waters and were nothing but wharves in every sense of the word.

What then was the meaning of the first agreement with respect to reasonable taxes and assessments? It could not have meant a reservation of the right to levy a real estate tax on the wharves which were about to be constructed, for even if it is conceded that wharves were the subject of real estate taxes at that time, it would not be necessary for the borough to reserve the right to impose them, for since the basin was within borough limits, the borough could tax all legally taxable items for proper purposes. Similarly, the assessments mentioned could not have referred to the municipality's power to levy a public-improvements assessment, for the improvements had already been made and paid for with funds derived from the sale of lands under the

Act of April 8, 1833, P. L. 243. The answer lies in those portions of the Act of 1834 and its predecessors which gave the burgess and town council the right to preserve the basin and its fixtures and to regulate their use. Thus, the borough officials were not contracting for the borough in their general municipal capacity; they were contracting in the borough's capacity as agent for the Commonwealth in regulating and preserving the basin. In consequence, the 1837 agreement could only have meant that, in the light of the special concessions made to the lot owners in the basin, and in the light of the borough officers' regulatory powers, the benefits conferred upon the lot owners were contingent upon the covenant with respect to repairs. The reasonable taxes and assessments mentioned were, therefore, more in the nature of a licensing consideration than in the nature of a tax or assessment as those terms have come to be known.

From the context of the 1846 agreement it is apparent that the parties themselves were in doubt concerning the meaning of the words "reasonable taxes and assessments" included in the earlier contract, for the 1846 agreement specifically says so. To clarify this provision, the 1846 contract provided that the owners, in lieu of the taxing and assessment rights held by the regulatory body and reserved in the first agreement, agreed to keep the pier in perpetual repair under the borough's supervision. Supervision was a necessary element of the contract to repair, for the exclusive duty of supervision over the basin's fixtures had been reposed by the legislature in the borough officials. The remedies of the borough officials in the event the pier was not repaired were fixed in the second agreement in perpetuity, first by making the obligation to repair a perpetual lien on the lots, second by giving the borough officials the option of repairing and bringing suit for the cost thereof after 30 days' notice, and third, and

probably most important to our view, by giving the officials, at their option, the right to include the cost of repairs in the tax duplicate. This last provision, standing alone, would be meaningless if the "reasonable taxes and assessments" mentioned in the contract meant the real estate taxes of the municipality or a special benefits assessment by the same body. The obligation to pay real estate taxes is, in fact, a perpetual obligation of a land owner so long as he wishes to hold absolute title, and the land itself is always impressed with the public's right to demand taxes, including the right of government to look to the land itself for payment. In the normal course, if taxes are not paid on real estate, the tax is included in the "duplicate of the season." Thus, the parties to the 1846 agreement must have understood that the taxes and assessments mentioned referred only to a type of levy amounting to a licensing consideration, for otherwise the contract would have provided that in the event of default the borough officials could have recourse to normal collection procedures. The obligation to pay taxes is not contractual; the obligation in this instance to make repairs was, however, a proper subject of contract, and the owners had the right to concede to the borough officials an expeditious means of enforcing the contract, including the right to put the cost of repairs in the tax duplicate.

The position taken by defendants is that there was a failure of consideration which released them of their covenant to repair. They maintain that the 1846 agreement substituted the covenants to repair in place of the taxes and assessments mentioned in the 1837 agreement, and that such taxes and assessments referred to municipal real estate and special-benefits assessments. To strengthen this contention, they point out that when the agreements were drawn there was no prohibition against a municipality abdicating its right to levy a

general tax and no restriction against the conferring of special benefits on one taxpayer to the detriment of others. Article IX, sec. 1, of the Constitution of 1874, requiring uniformity of taxation and restricting exemptions, was not in force when the agreements were drawn, and there were no similar constitutional provisions in prior charters. It was not until Mott v. P. R. R., 30 Pa. 9, 27-9 (1858), that it was established as a matter of law that an intentional exemption from taxation not specially authorized by the Constitution was illegal and void. From this, defendants argue that the borough officials thought they were authorized to bargain away their taxing rights and, in fact, did so in the two agreements. Consequently, when the borough subsequently collected real estate taxes on the outshore lots as they were required by law to do, the consideration for the covenants to repair disappeared.

This contention of defendants might be valid if it were true that the borough officials were bargaining away their right to levy a general real estate tax, but, as pointed out above, such was not the case. It is an axiom of interpretation that the construction placed upon a disputed contract by the parties thereto, as shown by their acts or declarations, will ordinarily be adopted, and will be referred to in determining the true nature of the agreement: O'Neill v. Atlas Automobile Finance Corporation, 139 Pa. Superior Ct. 346, 354. Here, as shown by the stipulation, the owners have paid their real estate taxes without protest and have, from time to time, made repairs to the pier. At least one owner at one time tried to have the contracts enforced for his benefit. See Walker v. Erie, 64 Pa. Superior Ct. 525. Therefore, by their own acts, the owners have construed the contracts in consonance without our view.

We consider it important to bear in mind in this case that a distinction must be made between the borough officials acting in their general municipal capacity

and the borough officials acting for the municipality as a regulatory body for the Commonwealth. The Act of 1834, supra, specifically provided that the borough officials were to have regulatory powers in bay waters "until the legislature shall otherwise provide", thus clearly indicating that the Commonwealth was not relinquishing its dominion over the area in question. This act also restricted the burgess and council's right to impose restrictions, prohibitions and penalties to the public interest and welfare of the Commonwealth and not solely to the interest and welfare of the borough. When Erie was made a city by Act of April 14, 1851, P. L. 631, no mention was made of the basin, that act being concerned primarily with continuing in effect the statutes relating to borough affairs as such. However, nine years later, by Act of April 2, 1860, P. L. 611, the legislature again indicated its intention of controlling the basin through the municipality by giving the Select and Common Councils of the City the power to make rules and regulations as to the use and control of the causeway and the public dock as they might deem necessary and proper; and make such charges for the use of the same, or any part thereof, as may be deemed expedient, and to enforce the collection thereof in such manner as they may deem proper. It is clear, therefore, that in construing the acts of the borough and its officials and the contracts which they made with respect to bayfront waters, they were agents of the Commonwealth and were not acting solely in borough affairs. They had an absolute right to impose such conditions on the owners' use and occupancy of the outshore lots as they saw fit, including the right to levy assessments for repairs and to impose levies for basin and pier use which bore no relation to borough taxes or assessments, by whatever name they were called. In fact, had the terms "tolls or wharfage" been used, the contracts would have been even more

confusing, for under the Act of 1833, P. L. 275, they
had the right to levy these charges in the exercise of
their municipal function unrelated to their function
as agents of the Commonwealth. One more Act of As-
sembly must be referred to, although it is not clear
that this statute has any bearing upon the problem
before us, except incidentally. By Act of May 1, 1861,
P. L. 614, sec. 6, the City of Erie was authorized to
appropriate $2,000 for the purpose of dredging the
bars in the channel of the harbor of Erie, and was
authorized to assess a tax, for one year, for the pur-
pose of paying such appropriation, said tax not to be
applied for any other purpose. The tax was not author-
ized until $4,000 was supplied by other parties for the
same purpose. The act further provided that any of
the said appropriation made by the city that was not
needed for dredging, might be used to repair the public
dock in front of the city.

This statute may have reflected the legislature's
view that the city was obligated to make repairs to the
docks, or it may have recognized that all of the resi-
dents of the city were interested in harbor facilities
and that any surplus over dredging costs should be
applied to the relief of outshore lot owners who had the
repair duty. However, whatever the legislature may
have had in mind, it is not clear that it was aware of
the arrangements made between the city and outshore
lot owners or that, if it was aware of such arrange-
ments, it intended to impose repair liability on the city.
Not knowing what the cost of dredging might be, and
not knowing what else to do with any overplus, it was
logical for the assembly to allow the application of the
surplus, if any, to repairs, knowing that it was to the
people's advantage generally to have good docking fa-
cilities. Had the legislature thought that the city had
a perpetual obligation to make repairs in the discharge
of its supervisory duties over the harbor, it would not

have limited the act in question to overplusses in dredging costs, nor to a taxing power for only one year. The act would have allowed a perpetual tax for repair purposes and would have divorced repairs from dredging. In consequence, we regard this later act as being of no significance in our present problem.

In conclusion, therefore, we are constrained to hold that the present lot owners are bound by the perpetual obligation to repair, created by their predecessors in title by contract; that the levying and collection of real estate taxes by the municipality in no way affected the owners' contractual obligation to repair, and that this obligation remains because the original lot owners bound their heirs and assigns to the covenants of the two agreements. However, since plaintiff merely notified the owners to repair and has not pursued the remedies afforded by the 1846 agreement, we must leave the parties in the position which they occupied at the beginning of the case. We can only construe the contracts in the manner provided in section 2 of the Declaratory Judgments Act of June 18, 1923, P. L. 840, 12 PS §832, but we cannot pursue the matter further. Because of this, both sides should bear their own share of the costs of the action.

We have made no extended reference in this discussion to the provisions of the contract relating to the payment of a fee for the maintenance of the causeway, for that matter is not important to this case. The causeway was to be used as a public cartway by the lot owners and was not of the substantial construction of the pier. Due to the contemplated heavy traffic over the causeway, more frequent but less extensive repairs were probable than in the case of the pier and special treatment in the contract was necessary.

### Conclusions of Law

1. The contracts dated January 20, 1837, and September 12, 1846, are valid and existing contracts which

bind the successors of the parties thereto to the covenants therein contained.

2. The parties to this action, being successors to the parties to the two contracts mentioned in conclusion of law no. 1, are bound by the terms thereof.

3. The two contracts mentioned in conclusion of law no. 1, fix the responsibility for the making of repairs to the public pier involved in this action on defendants insofar as such repairs are needed in the area adjacent to defendants' outshore water lots. The obligation to make repairs is binding upon defendants in perpetuity so long as they are owners of the lots involved in the within dispute, and is binding upon all subsequent owners of said lots in perpetuity.

4. The obligation to make repairs to the pier in that portion thereof opposite the portion of Outshore Lot No. 69 conveyed to the City of Erie, as recited in finding of fact no. 5, is reposed in defendants according to the reservation of dock rights and privileges noted in findings of fact nos. 3, 5 and 6.

5. The obligation to make repairs to the public pier mentioned in conclusions of law nos. 3 and 4, in addition to being an obligation upon the owners of the outshore water lots involved in this dispute so long as they remain owners, is a perpetual and binding lien upon said lots.

6. The obligation to make repairs mentioned in conclusions of law nos. 3 and 4, and the existence of the perpetual lien mentioned in conclusion of law no. 5, are independent of the right of the City of Erie to levy and assess general real estate taxes on the lots involved in this dispute and said obligation and lien are not affected by the levy of real estate taxes thereon by the City of Erie.

7. Apart from the giving of notice as provided in the contracts, the conditions precedent to plaintiff's right to collect money damages from defendants, or to

include the cost of repairs in the tax duplicate of the season, have not been met by plaintiff and, in consequence, no money damages may be awarded to plaintiff in this case. Because all of the conditions precedent have not been met, the costs of this case must be divided equally between the parties.

8. The judgment in this case is binding only on the parties mentioned in the caption hereto and their heirs, assigns or successors and affects only the lots involved herein.

### Declaratory Judgment

And now, to wit, May 3, 1963, it is decreed:

1. The responsibility for repairing the public pier on the bay side opposite defendants' outshore water lots rests in defendants who must repair the same at their own cost or abide the consequences provided in the agreement dated September 12, 1846, between defendants' predecessors in title and plaintiff's predecessor in right.

2. The responsibility for repairing the public pier on the bay side of plaintiff's portion of Outshore Lot No. 69, rests upon defendants.

3. Defendants' outshore lots are individually impressed with a perpetual lien to ensure payment of the cost of any repairs made by plaintiff on the pier opposite said outshore lots.

4. The obligation to make repairs and the lien respecting the same as provided in this judgment is independent of the right of the City of Erie to levy and collect real estate taxes on defendants' outshore lots.

5. The contracts dated January 20, 1837, and September 12, 1846, are valid and existing agreements which fix the rights of the parties hereto independent of the purported fee simple title conveyed to defendants' predecessors in title by plaintiff's predecessor in right.

6. This judgment is binding only upon the parties to this action, their heirs, assigns and successors and affects only the lots involved herein. It does not adjudicate inter se any rights reserved in any deeds of conveyance made between defendants and their predecessors in title.

7. The parties hereto shall pay the costs in equal proportions.